1  **WHGC, P.L.C.**
   Jeffrey C.P. Wang (SBN 144414)
2  *JeffreyWang@WHGCLaw.com*
   Paul N. Tauger (SBN 160552)
3  *PaulTauger@WHGCLaw.com*
   Kenneth A. Ohashi (SBN 230440)
4  *KennethOhashi@WHGCLaw.com*
   Esther A. Nguonly (SBN 289940)
5  *EstherNguonly@WHGCLaw.com*
   1301 Dove Street, Suite 1050
6  Newport Beach, California  92660
   Tel:   (949) 833-8483
7  Fax:   (949) 833-2281

8
   *Counsel for Plaintiff*
9  HANERGY THIN FILM POWER AMERICA INC. d/b/a HANERGY USA SOLAR
   SOLUTION LTD. d/b/a HANERGY AMERICA SOLAR SOLUTIONS
10

11              **UNITED STATES DISTRICT COURT**

12            **NORTHERN DIVISION OF CALIFORNIA**

13 | HANERGY THIN FILM POWER | CASE NO. |
14 | AMERICA INC. d/b/a HANERGY | |
   | USA SOLAR SOLUTION LTD. d/b/a | Judge: |
15 | HANERGY AMERICA SOLAR | Magistrate: |
   | SOLUTIONS, a California corporation, | |
16 | | |
   | Plaintiff, | |
17 | | |
   | v. | **COMPLAINT** |
18 | | |
   | COLUMBIA SOLAR ENERGY, LLC | |
19 | d/b/a COLUMBIA SOLAR ENERGY | |
   | GENERATION, LLC, a Delaware | |
20 | limited liability company, | |
21 | | |
   | Defendant. | |
22

23        Plaintiff Hanergy Thin Film Power America Inc. d/b/a Hanergy USA Solar

24  Solution Ltd. d/b/a Hanergy America Solar Solutions, by and through its attorneys,

25  WHGC, P.L.C., and as for its Complaint against Defendant Columbia Solar Energy,

26  LLC d/b/a Columbia Solar Energy Generation, LLC, alleges as follows:

27                       **INTRODUCTION**

28      1.    This is an action for breach of contract.

---

**PARTIES**

2.      Plaintiff Hanergy Thin Film Power America Inc. d/b/a Hanergy USA Solar Solution Ltd. d/b/a Hanergy America Solar Solutions ("Plaintiff" or "Hanergy") is a corporation organized and existing under the laws of the State of California, with its principal place of business located at 1350 Bayshore Highway, Suite 825, Burlingame, California 94010.

3.      Defendant Columbia Solar Energy, LLC d/b/a Columbia Solar Energy Generation, LLC ("Defendant" or "Columbia") is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business located at 80 Park Plaza, T-20, Newark, NJ 07102.

**JURISDICTION AND VENUE**

4.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1132 because Plaintiff and Defendant are citizens of different states and the amount in controversy exceeds $75,000.

5.      This Court has personal jurisdiction over the Defendant because the contract at issue was negotiated, executed, and performance was required to be completed in, the State of California.

6.      Venue is proper in this judicial district because a substantial part of the events giving rise to the allegations contained in this Complaint took place in this district.

**FACTS COMMON TO ALL COUNTS**

7.      Plaintiff invests in projects involving the development and operation of solar electric power plants.

8.      On October 1, 2014, Plaintiff and Defendant entered into a Master Procurement Agreement (amended August 5, 2015) ("MPA") governing one such project ("Project"), whereby Plaintiff would procure and provide for Defendant certain equipment and services necessary for developing and constructing a solar electric generating facility in Pittsburg, California.  A true and correct copy of the

1    MPA and Amendment No. 1 is attached hereto as Exhibit A.  The Project, once
2    complete, would sell electricity to Pacific Gas and Electric Company ("PG&E").

3         9.    As consideration, Defendant would pay Plaintiff a total sum of
4    $30,906,800.00 (the "Procurement Fee") in accordance with the schedule set forth in
5    Exhibit B-1 to the MPA (the "Procurement Fee Schedule") and reimburse certain
6    construction costs.  Under the Procurement Fee Schedule, Defendant was required to
7    pay Plaintiff the Procurement Fee upon Plaintiff's achievement of several defined
8    milestones.

9         10.    In conjunction with the MPA, Plaintiff entered into an agreement to sell
10   Columbia to buyer PSEG Solar California LLC ("PSEG"), a transaction which
11   would gain PSEG an energy investment tax credit equal to 30% of the basis of the
12   Project.  Ultimately, the buyer would also benefit from the Project's sale of energy
13   to PG&E.

14        11.    On August 5, 2015, PSEG acquired 100% of the equity interests of
15   Columbia from Plaintiff's affiliate.

16        12.    On November 16, 2015, Plaintiff, having fulfilled all of its requirements
17   under the MPA's "substantial completion" milestone, submitted to Defendant an
18   invoice and accounting reflecting an amount due from Defendant of $6,368,205.29.
19   Additionally, Plaintiff will be owed $3,906,800.00 (subject to the adjustment
20   provisions of the MPA) upon final completion.

21        13.    On November 30, 2015, Defendant confirmed in writing that it refused
22   to pay the outstanding amount due Plaintiff.

23        14.    To date, Defendant has failed and refused, and continues to fail and
24   refuse to pay the amount owing to Plaintiff, claiming, in part, that Project revenue
25   levels fell short of expectations.

26   / / /
27   / / /
28   / / /

1

## COUNT ONE

2

### (Breach of Contract)

3      15.     Plaintiff repeats and re-alleges the allegations of the preceding

4  paragraphs of this Complaint as if set forth fully herein.

5      16.     Plaintiff has performed all of its obligations pursuant to the MPA,

6  except those that were excused or waived by Defendant.

7      17.     Pursuant to the MPA, Defendant had an obligation to make payment to

8  Plaintiff.  Defendant has failed and refused, and continues to fail and refuse, to do so

9  in breach of its obligations under the MPA.

10     18.     As a direct and proximate cause of Defendant's acts, Plaintiff has

11 suffered damages in the amount of no less than $6,368,205.29.

12

## COUNT TWO

13

### (Anticipatory Breach by Columbia)

14     19.     Plaintiff repeats and re-alleges the allegations of the preceding

15 paragraphs of this Complaint as if set forth fully herein.

16     20.     Plaintiff has performed all of its obligations pursuant to the MPA,

17 except those that were excused or waived by Defendant.  Defendant has confirmed

18 in writing that it has refused, and will continue to refuse, to perform its own

19 obligations pursuant to the MPA.

20     21.     Defendant's refusal to honor its obligations pursuant to the MPA

21 constitutes anticipatory repudiation of the MPA by Defendant.

22     22.     As a direct and proximate cause of Defendant's acts, Plaintiff has

23 suffered damages of no less than $3,906,800.00 for Defendant's anticipatory

24 repudiation of payment of the final completion payment.

25

## PRAYER FOR RELIEF

26     WHEREFORE, Plaintiff respectfully requests the Court enter judgment

27 against Defendant as follows:

28 / / /

1    (a)    For compensatory and consequential damages, plus interest and

2           accruing interest;

3    (b)    For attorneys' fees;

4    (c)    For costs of suit; and

5    (d)    For such other relief as the Court deems just and equitable.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: December 14, 2015         Respectfully submitted,

Jeffrey C.P. Wang (CA SBN: 144414)
**WHGC, P.L.C.**
1301 Dove Street, Suite 1050
Newport Beach, CA  92660
Tel:  (949) 833-8483
Fax:  (949) 833-2281
Email: JeffreyWang@WHGCLaw.com
*Counsel for Plaintiff*

# EXHIBIT A

EXHIBIT A

EXECUTION VERSION

# MASTER PROCUREMENT AGREEMENT

THIS MASTER PROCUREMENT AGREEMENT (this "Agreement") is made effective as of October 1, 2014, by and between Hanergy USA Solar Solution Ltd., a California corporation (d/b/a Hanergy America Solar Solutions) ("Hanergy"), and Columbia Solar Energy, LLC, a Delaware limited liability company (the "Project Company"). Hanergy and Project Company are each referred to individually as a "Party" and, collectively, as the "Parties".

## RECITALS

WHEREAS, the Project Company is in the process of developing, planning, permitting and constructing an approximately 19 MW AC photovoltaic solar electric generating facility to be located in Pittsburg, California (the "Project");

WHEREAS, on August 27, 2014, McCarthy Building Companies, Inc., a Missouri Corporation ("Contractor"), and the Project Company entered into that certain Solar Project Engineering, Procurement and Construction Agreement (the "EPC Agreement") related to the engineering, construction and commissioning of the Project, under which the Project Company is to provide certain Owner Supplied Equipment (as defined in the EPC Agreement);

WHEREAS, on the date hereof, 2014, HGSG-NA Land Power 1, LLC, a Delaware limited liability company ("HGSG-NA"), and PSEG Solar California LLC, a Delaware limited liability company entered into that certain Purchase and Sale Agreement (the "PSA") related to the purchase and sale of the Project Company;

WHEREAS, upon the closing of the transaction contemplated by the PSA (the "Closing"), PSEG Solar California will acquire the Project Company, which date shall be referred to herein as the "Closing Date";

WHEREAS, the Project Company desires to engage Hanergy to procure and provide or assist it in procuring the Equipment described in the supply agreement(s) and purchase order(s) attached as Exhibit A hereto (the "Equipment"); and

WHEREAS, capitalized terms not otherwise defined herein shall have the meaning given in the PSA.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1. Procurement of Equipment.

    (a)    Subject to the terms and conditions set forth herein, Hanergy agrees to procure and provide the Equipment to the Project for the benefit of the Project Company. Hanergy represents and warrants to the Project Company that it possesses or will acquire the skill and capacity necessary to perform the services related to the procurement of the Equipment, as such Equipment is further described on Exhibit A. The

parties acknowledge and agree that the Equipment described on <u>Exhibit A</u> shall include all of the Owner Supplied Equipment (as defined under the EPC Agreement) and all permanent communications equipment required under the PPA.

(b)       Notwithstanding anything to the contrary in <u>Exhibit A</u>, Hanergy shall procure and deliver the Equipment to the Project Company in accordance with the requirements of the EPC Agreement relating to the delivery of Owner Supplied Equipment and shall be responsible for all losses incurred by the Project Company as a result of a failure to deliver the Equipment on a timely basis in accordance with the requirements of the EPC Agreement. Title to the Equipment and risk of any loss or damage to the Equipment shall pass to Project Company free and clear of all liens, security interests and any other claims upon the physical receipt by Project Company of the Equipment and associated documentation at the location specified on <u>Exhibit A</u> hereto.

(c)       Upon Hanergy's reasonable written request, Project Company shall provide free of charge to Hanergy the relevant quarterly plant performance data (at the inverter level) routinely collected by Project Company on the performance of the Project after commercial operations of the Project for a period of two (2) years thereafter. All data relating to Project production shall be considered Confidential Information under this Agreement and will not be shared externally by Hanergy without the written consent of Project Company. Hanergy may use the production data in an aggregated, blended form with production data from other solar facilities developed by Hanergy solely for research and marketing purposes. Under no circumstances shall the Project's production data be disclosed on a project identifiable basis.

    2.   <u>Compensation</u>.

(a)       <u>Procurement Fee</u>. As full and complete consideration to Hanergy for the costs of the Equipment and compensation for the services provided hereunder, the Project Company shall pay to Hanergy a procurement fee (the "<u>Procurement Fee</u>") of Thirty One Million Nine Hundred Six Thousand and Eight Hundred Dollars ($31,906,800.00), which Procurement Fee shall be subject to adjustment as provided on <u>Exhibit B-1</u>. The Procurement Fee is inclusive of any and all sales or use taxes or other taxes, duties, stamp taxes, or other impositions of any amount that may be imposed by any Governmental Authority (as defined in the EPC Agreement) upon the Project Company with respect to this Agreement. The Procurement Fee does not include the reimbursable costs per Section 2(b), which shall be paid to Hanergy in addition to the Procurement Fee.

(b)       <u>Other Reimbursable Costs</u>. Hanergy shall provide the Project Company written invoices and other documentation for certain other amounts as set forth on <u>Exhibit B-2</u> and the Project Company shall reimburse Hanergy as set forth on <u>Exhibit B-2</u>.

    3.   <u>Confidentiality</u>. The Parties agree that all information disclosed (i) pursuant to this Agreement, (ii) in connection with the transactions contemplated by this Agreement or

(iii) in the discussions and negotiations related to this Agreement (collectively, the "Confidential Information") shall be deemed to be "Confidential Information" pursuant to the Confidentiality Agreement, the terms and conditions of which shall govern the treatment of all Confidential Information. The obligations of the Parties under this Section 3 shall terminate on the second anniversary of the Effective Date (as defined in the Confidentiality Agreement).

4. Standard for Procurement of Equipment. Hanergy shall use such diligence, care and prudence in the procurement of the Equipment and shall devote such time, effort and skills of its employees as an ordinary service provider in like position would do in like circumstances, provided that Hanergy shall be deemed to have satisfied its duties in respect of any specific matter or circumstance requiring interpretation, application, or enforcement of contracts to which the Project Company is a party, if it acts in accordance with Prudent Industry Standards, which shall include the reasonable reliance on the advice of counsel, qualified consultants and PSEG Solar California LLC and its affiliates as Owner of the Project. For purposes of this Agreement, "Prudent Industry Standards" means those standards of care and diligence normally practiced by project developers/owners in the solar energy industry in performing services of a similar kind in the jurisdiction in which the work will be performed. Prudent Industry Standards are not intended to require optimum practice or methods, but rather to be a spectrum of reasonable and prudent practices and methods that must take the conditions specific to any given project under consideration. It is understood and agreed that Hanergy is not guaranteeing or undertaking to procure any financial or other outcome with respect to the Project.

5. EPC Agreement. Subject to reimbursement as provided in Exhibit B-2, Hanergy shall pay, perform and discharge all obligations of the Project Company with respect the Contract Price (as defined in the EPC Agreement) from the Effective Date through the Closing Date.

6. Interconnection Costs. Hanergy shall pay, perform and discharge all obligations of the Project Company with respect to interconnection of the Project, including any costs relating thereto, which are in excess of the SGIA Deposits, whether assessed on the Project Company before or following the Closing (the "Interconnection Costs"), provided that any costs, which are identified by PG&E prior to Closing as being reimbursable to the Project Company under the SGIA, shall be reimbursed to Hanergy in accordance with Exhibit B-1.

7. Term of Agreement. Subject to Exhibit B-1 and Exhibit B-2, this Agreement shall have a term commencing on the date hereof and terminating on the Final Completion Date (as defined in the EPC Agreement). Upon expiration of this Agreement, the services provided hereunder shall terminate and Hanergy shall have no further duty or obligation hereunder; provided, however, that the provisions relating to the Procurement Fee set forth in Section 2 and Exhibit B-1 and Exhibit B-2, the provisions relating to the EPC Agreement set forth in Section 5, the provisions relating to the payment of Interconnection Costs set forth in Section 6, the confidentiality provisions set forth in Section 3 and the data monitoring provisions of Section 1(c) shall survive the expiration of this Agreement as set forth herein.

8. No Assignment Absent Consent. This Agreement shall be binding on and inure to the benefit of each Party's respective successors and assigns, provided, however, that

EXECUTION VERSION

neither Party may transfer, sell or assign, whether by operation of law or otherwise, its rights or obligations under this Agreement without the prior written consent of the other Party, which consent shall not be unreasonably withheld. Any attempt by a Party to transfer, sell or assign, whether by operation of law or otherwise, its rights or obligations under this Agreement without the prior written consent of the other Party shall be void and without force or effect.

9.  Limitation on Liability.  Except as provided in Exhibit B-1, neither Party, nor their respective officers, partners, shareholders, members or employees shall be liable hereunder for punitive, consequential or intangible damages of any nature including, but not limited to, damages for lost profits or revenues or the loss or use of such profits or revenue, and/or loss by reason of the Project's failure to reach Commercial Operation (as defined in the Power Purchase Agreement), shutdown or inability to operate at rated capacity, increased operating expenses of plant or equipment, increased costs of purchasing or providing equipment, materials, labor, services, costs of replacement power or capital, debt service fees or penalties, inventory or use charges, damages to reputation, damages for lost opportunities, or claims of the Project Company's customers, members or affiliates, regardless of whether said claim is based upon contract, warranty, tort (including negligence and strict liability) or other theory of law. In no event shall Hanergy's liability, arising out of or relating to this Agreement, whether based on contract, tort, strict liability, other Laws or otherwise, exceed Ten Million Dollars ($10,000,000).

10. Entire Agreement.  This Agreement constitutes the sole and entire agreement of the Parties with respect to the subject matter contained herein, and supersedes all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter.

11. Amendment and Modification; Waiver.  This Agreement may only be amended, modified or supplemented by an agreement in writing signed by each Party hereto. No waiver by any Party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the Party so waiving. No waiver by any Party shall operate or be construed as a waiver in respect of any failure, breach or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver. No failure to exercise, or delay in exercising, any right, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

12. Governing Law.  This Agreement shall be governed, construed and enforced in accordance with the laws of the State of New York without giving effect to any choice or conflict of law provision or rule (whether of the State of New York or any other jurisdiction).

13. Notice.  All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be deemed to have been given (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by facsimile or e-mail of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next business day if sent after normal business hours of the recipient or (d) on the third day after the date mailed, by certified or registered mail, return

receipt requested, postage prepaid. Such communications must be sent to the respective Parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this Section 13:

    (i)    If to Hanergy:

Hanergy USA Solar Solution Ltd.
(d/b/a Hanergy America Solar Solutions)
Attn: President
1350 Bayshore Hwy, Suite 825
Burlingame, CA 95222
Tel: (650) 288-3722
Fax: (650) 288-3719

with a copy to:

Foley & Lardner LLP
Attn: Jeff Atkin
555 South Flower Street, Suite 3500
Los Angeles, CA 90071
Tel: (213) 972-4500
Fax: (213) 486-0065
Email: jatkin@foley.com

    (ii)    Prior to the Closing: If to the Project Company:

Columbia Solar Energy, LLC
c/o HGSG-NA Land Power 1, LLC
1350 Bayshore Hwy, Suite 825
Burlingame, CA 94010
Attn:   President
Fax:    (650) 288-3719

After the Closing: If to the Project Company:

Columbia Solar Energy, LLC
c/o PSEG Solar Source LLC
80 Park Plaza, T-20
Newark, NJ 07102
Attention:      President
Telephone:      (973) 430-7497
Facsimile:      (973) 624-2892

With a copy to:

PSEG Solar Source LLC
80 Park Plaza, T-4
Newark, NJ 07102
Attention:      Corporate Secretary
Telephone:     (973) 430-8878
Facsimile:     (973) 643-8349

14.  Severability.  If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction.  Upon such determination that any term or other provision is invalid, illegal or unenforceable, the Parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

15.  Headings.  The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

16.  Expenses.  Except as otherwise expressly provided herein, all costs and expenses, including, without limitation, fees and disbursements of counsel, financial advisors and accountants, incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the party incurring such costs and expenses, whether or not the Closing shall have occurred.

17.  Counterparts.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

[SIGNATURE PAGE FOLLOWS]

EXECUTION VERSION

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

HANERGY USA SOLAR SOLUTION LTD. (d/b/a HANERGY AMERICA SOLAR SOLUTIONS)

By: _____

Name: Wu Yi'

Title: CEO

COLUMBIA SOLAR ENERGY, LLC

By: _____

Name: Wu Yi'

Title: CEO

[Signature Page to Master Procurement Agreement]

## EXHIBIT A

**SUPPLY AGREEMENT (OR FORM THEREOF), SPECIFICATION SHEETS, WARRANTIES AND DELIVERY SCHEDULE FOR ALL OWNER SUPPLIED EQUIPMENT (AS DEFINED IN THE EPC AGREEMENT)**

**[SEE ATTACHED.]**

MODULE SUPPLY AGREEMENT

This Module Supply Agreement (this "Agreement") is made by and between Hanwha SolarOne USA INC. ("Seller"), a [California corporation], with its principal place of business at 2424 Walsh Ave, Santa Clara, CA 95051 and Hanergy USA Solar Solution Ltd. (d/b/a Hanergy America Solar Solutions) ("Buyer"), a California corporation, with its principal place of business at 1350 Bayshore Hwy, Suite 825, Burlingame, CA 94010.  This Agreement is effective as of October 1, 2014 (the "Effective Date").

RECITALS

WHEREAS, Seller desires to sell solar Modules to Buyer; and

WHEREAS, Buyer wishes to purchase those Modules on the terms and conditions of this Agreement.

AGREEMENT

In consideration of the mutual promises and covenants set forth below, the parties agree as follows:

1.     General Obligations.

1.1     Product.  The model(s) and quantity of solar photovoltaic modules that are subject to the terms and conditions of this Agreement are listed in Exhibit A (the "Modules").  The specifications for the Modules are set forth in the Module Data Sheet(s) attached hereto as Exhibit B (the "Specifications").  The Modules shall be newly manufactured (and not from inventory existing on the Effective Date).  The Purchase Order shall be countersigned by Seller and identify the location of assembly of the Module and the origin of the cells

1.2     Nature of Purchases.  Buyer shall purchase the Modules solely for use in the assembly of Buyer's systems.  Buyer covenants and warrants that it is not purchasing the Modules for resale or distribution on a stand-alone basis. Buyer shall not sell, ship, deliver, distribute, transfer, license, loan, lease or otherwise dispose of Modules on a stand-alone basis.  For the avoidance of doubt, this paragraph does not prohibit Buyer from selling, once completed, a solar energy project that utilizes the Modules for the production of renewable power.

2.     Purchase and Sale.

2.1     Quantity.  Subject to the terms and conditions of this Agreement, Seller hereby sells, and Buyer hereby purchases, that quantity of Modules equivalent to 25,634,515 Watts DC, the models and specifications of which shall be as identified in Exhibit A (the "Committed Quantity"), to fulfill a portion of Buyer's solar module requirements for Buyer's 19 MWac solar project at Pittsburg, CA (the "Project"). The Module shipment schedule is listed in Exhibit C.  In addition, Buyer may, in its sole and absolute discretion, purchase up to 200,000 Watts DC (the "Additional Quantity") of additional Modules for the Project (of the same models and specifications as the Modules identified on Exhibit A) by delivering to Seller a purchase order for all or any portion of the Additional Quantity at the same price and under the same contract terms as the Committed Quantity referencing this Agreement on or before March 31, 2015.  Seller and Buyer shall negotiate in good faith the Module shipment exhibit for such additional Modules and incorporate the same as an addendum to Exhibit C.

2.2    Shipment Report. Together with each shipment of Modules to the Project site, Seller shall provide to Buyer, in electronic form, a report identifying each Module by serial number, pallet, bin/batch number, country of origin, stated wattage and flash test data.  Prior to the first delivery of the Modules Seller shall deliver to Buyer PAN file(s) for each Module type (by wattage) included in the Modules.

2.3    Shipments.  All shipments shall be made DDP (INCOTERMS 2010) to the project site, 2907 Pittsburg-Antioch Highway, Pittsburg, CA 94565 (the "Delivery Point").  Title and risk of loss will pass to Buyer at the Delivery Point. Prior to each shipment, Seller shall notify Buyer of the Model and quantity to be shipped.

2.4    Delay Liquidated Damages.  Any Modules delivered after the applicable delivery week per Exhibit C shall be subject to delay liquidated damages of $2,000 per MW DC per day.  Notwithstanding the foregoing,  Seller shall not be liable for delay in delivery (or non-delivery) due to causes beyond Seller's control, including, but not limited to, acts of God, acts of Buyer, acts of civil or military authority, acts of terrorism, war, riots, fires, and regional strikes and lockouts.  Seller reserves the right, in its sole discretion upon prior written notice to Buyer, to allocate inventories and current production and substitute suitable materials when such allocation or substitution is necessary to prevent or mitigate delivery delays due to any such circumstances or causes.

2.5    Cancellation Liquidated Damages.  If Buyer cancels any or all of the Committed Quantity or Additional Quantity, then Buyer shall pay to Seller as liquidated damages for such Committed Quantity or Additional Quantity in accordance the table below:

| Days prior to 1st delivery date of Committed Quantity or Additional Quantity ordered | % of Purchase Price (MW) of Quantities Cancelled |
|---|---|
| Greater than 60 days | 1% |
| Less than 60 and greater than 30 | 5% |
| Less than 30 days | 10% |

If Buyer causes or requests a delay in the initial delivery date of the Committed Quantity or the Additional Quantity upon less than ninety (90) days' notice to Seller, then Buyer shall be liable for Seller's actual and documented additional costs for such Modules, including storage, security and insurance costs, not to exceed two percent (2%) of the Purchase Price per MW DC.  Seller shall make commercially reasonable efforts to mitigate and reduce such costs.  Any date in the initial delivery date of the Committed Quantity or the Additional Quantity may not be delayed more than ninety (90) days in aggregate from the date originally set forth on Exhibit C.

2.6    Change Orders. Seller and Buyer shall negotiate in good faith any Buyer proposed changes in the Module quantity (to the extent less than the Committed Quantity or greater than the Committed), delivery schedule and specifications.

3.    Product Acceptance.  Buyer must immediately inspect each shipment upon receipt to check the quantities of delivered Modules and the Modules for shipment discrepancies and damage.  Buyer must report all discrepancies and damage to Seller. The units of Modules shipped will be deemed

accepted by Buyer unless notice of defect is received by Seller within 10 business days of receipt. Buyer may only reject Modules that are the wrong model, are visibly damaged, or that fail to conform to the Specifications. Buyer's sole remedy, and Seller's exclusive obligation, is, at Seller's option, to repair the defective Module unit or replace it with an equivalent unit. Notwithstanding the foregoing, any Modules containing latent defects not capable of discovery upon visual inspection and not rejected hereunder shall continue to be protected under the warranties set forth in Article 7.

4.      Installation and Access.

4.1      Design Verification Services. Seller will provide reasonable assistance to Buyer or its designated contractor in engineering design verification of the Project. However, Buyer shall be solely responsible for the design and implementation of the Project, and Seller makes no warranty of any kind with respect to project design or any design verification services provided by Seller hereunder.

4.2      Installation. Buyer shall install Modules solely in a manner consistent with the installation guide documentation supplied by Seller and attached hereto as Exhibit D (the "Installation Guide").

4.3      Product Regulations and Required Terms for Downstream Contracts. Buyer acknowledges that the Modules are subject to regulations in various countries and jurisdictions and may be resold, installed and used only in certain countries and jurisdictions and, in such countries and jurisdictions, solely for specific applications that have been approved. As part of any sale of any system that incorporates the Modules, Buyer shall ensure

that the purchaser agrees in writing to be bound by, and adheres to, a contract that contain terms and restrictions that are consistent with those of this Agreement, including, without limitation, the prohibition on reverse engineering and the requirements to install Modules solely in a manner consistent with the Installation Guide.

5.      Price.

5.1      Price. The price of the Modules is set forth on Exhibit A (as defined therein, the "Purchase Price"). The Purchase Price reflects shipping DDP (INCOTERMS 2010) to the Delivery Point.

5.2      Taxes, Duties and Assessments.

(a)      The Purchase Price is exclusive of any sales and use tax related to the Modules (the "Taxes"). Buyer shall be responsible for the Taxes. All payments to be made by Buyer to Seller shall be made free and clear of and without any deduction of Taxes. Buyer shall indemnify and hold Seller harmless from the Taxes. Seller shall be responsible for any customs, import duties, tariffs, value-added tax and any other charges or withholdings of a similar nature levied as a consequence of the manufacture of and importation of the Modules into the United States, including any such duties or tariffs that may be imposed after the Effective Date but prior to importation of the Modules into the United States or retroactively imposed against Seller after importation. The Parties acknowledge and agree that Seller is "importer of record," as that term is defined in 19 U.S.C. Section 1484, for all purposes with respect to the importation of the Modules.

(b)      If any negotiated settlement or suspension agreement between the People's

3

Republic of China or the Republic of China (or any division or agency thereof) on the one hand, and the United States of America, on the other hand, occurs regarding import duties and the sale of the Modules or any portion thereof become subject to the terms of such settlement (e.g. due to a mandated price or price floor) (the "Negotiated Settlement"), then the Parties agree to reform this Agreement to the fullest extent permitted by law in order to allocate the economic impact of such settlement equally among the Parties.  To the extent that the Parties are unable to allocate equally the economic impact of any such settlement due to the terms of the Negotiated Settlement, then the Party that is disproportionately harmed by the settlement shall have the option to terminate this Agreement at its sole discretion.   To the extent that the Parties are unable to allocate equally the economic impact of any such settlement due to disagreement of the Parties, then the Parties agree to submit such allocation to binding arbitration under AAA Commercial Arbitration Rules utilizing Expedited Procedures thereunder. Notwithstanding the foregoing, it is the express intent of the Parties that the sale of the Modules hereunder be excluded from, and not subject to, the terms of any such possible settlement and the Parties each agree to take such further commercially reasonable actions, to the extent permitted by law, to effectuate this intent.  If Buyer delays delivery of the modules beyond the effective date of the Negotiated Settlement, and as a result Seller cannot reasonably deliver the committed quantity of modules because Seller must comply with the Negotiated Settlement, then Seller has the unilateral right to cancel the contract.

(c)      If Seller receives any assessment or other notice (collectively, the "Assessment") from a governmental taxing authority providing that the Taxes are due from Seller on account of Module sale transaction(s) under this Agreement, then Seller shall give Buyer written notice of the Assessment and Buyer shall pay to Seller or the taxing authority the amount set forth as due in the Assessment within thirty (30) days of receipt of the written notice from Seller.

6.      Payment.

6.1      Due Date.  Deposits shall be due as set forth in section 6.2 below.  Payments for the balance of the Purchase Price shall be due and payable net ninety (90) days from the date of the invoice.  Seller shall invoice Buyer upon each delivery of the Modules to the Delivery Point, as applicable per Exhibit C.

Buyer shall make all payments in US dollars, except as otherwise authorized by Seller in writing.

6.2      Deposit.  On or prior to October 10, 2014, Buyer shall issue a purchase order confirming Module model and price per the terms of Exhibit A and pay to Seller an amount equal to ten percent (10%) of the Purchase Price of the Committed Quantity and, within thirty (30) days of the date of any Buyer purchase order for any Additional Quantity, Buyer shall pay to Seller an amount equal to ten percent (10%) of the Purchase Price of such Additional Quantity (the "Deposit").

6.3      Late Payment Fee.  Seller may charge interest on late payments. Late interest will be computed on a daily basis, from the invoice due date until the date on which the invoice is paid in full, at the rate of one and one half percent

4

(1.5%) per month or the maximum rate permitted by law, whichever is less.

6.4     Buyer Parent Guaranty.  Hanergy Holding Group Ltd. hereby guarantees the payment obligations of Buyer under this Article 6.  Attached as Exhibit F is the form of Buyer Guaranty Agreement, which shall be executed and delivered to Seller on or prior to October 10, 2015.

6.5     Lien Waivers.  Upon reasonable request of Buyer, Seller shall deliver to Buyer a conditional lien waiver and, immediately upon payment in full of the purchase price (or upon applicable progress payments), Seller shall deliver to Buyer a final lien waiver and release (or progress payment lien waiver, as applicable) in each case compliant with California law and substantially in the form attached hereto as Exhibit G.

7.     Warranty.

7.1     Standard Limited Warranty.  Buyer has the limited warranty rights set forth on Exhibit E. Notwithstanding the terms of Exhibit E, Seller hereby warrants that degradation in performance of the Modules, based on the faceplate of the modules and under standard test conditions, shall in year one (which year shall commence as defined below) be no greater than three percent (3%) and in each year following year one shall be no greater than seven-tenths of one percent (0.7%) per year, as set forth on the table below.  Seller further warrants that in no event shall total degradation exceed eighteen percent (18%) at or prior to year 25.  The first measurement year shall commence on the date of delivery.

| Year | % of Faceplate |
|------|----------------|
| 1 | 97% |
| 2 | 96.3% |
| 3 | 95.6% |
| 4 | 94.9% |
| 5 | 94.2% |
| 6 | 93.5% |
| 7 | 92.8% |
| 8 | 92.1% |
| 9 | 91.4% |
| 10 | 90.7% |
| 11 | 90.0% |
| 12 | 89.3% |
| 13 | 88.6% |
| 14 | 87.9% |
| 15 | 87.2% |
| 16 | 86.5% |
| 17 | 85.8% |
| 18 | 85.1% |
| 19 | 84.4% |
| 20 | 83.7% |
| 21 | 83.0% |
| 22 | 82.3% |
| 23 | 81.6% |
| 24 | 80.9% |
| 25 | 80.2% |

For the avoidance of doubt, the warranties set forth in this Article 7 shall be in addition to the limited warranties set forth in Exhibit E and, to the extent of any inconsistency with the terms set forth in Exhibit E, the terms of this Article shall supersede and prevail over Exhibit E.

7.2     Limitation on Warranties.  THE WARRANTIES REFERENCED IN THIS ARTICLE 7, AND SET FORTH ON EXHIBIT E, ARE THE ONLY WARRANTIES MADE BY SELLER IN CONNECTION WITH THIS AGREEMENT.  SELLER DISCLAIMS ALL OTHER WARRANTIES, WHETHER STATUTORY, EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE AND NON-INFRINGEMENT OF THIRD PARTY RIGHTS.

7.3     Serial Defect.  If at least five percent (5%) of the Modules, or any batch or bin of the Modules delivered to the Project, exhibit repeated failures derived from the same component or root cause, and such failure results in a breach of the warranties contained herein, then a "Serial Defect" shall have occurred.  If a Serial Defect occurs, then all of the Modules (or all of the particular bin or batch, if applicable) shall be presumed to contain the same defect.  Seller can rebut this presumption and must perform an industry standard root cause analysis ("RCA") to determine whether the defect is due to materials, manufacturing or other causes, and must develop and implement a remediation plan which addresses the cause of the defect per the RCA, if such defect is covered by the warranties hereunder.  Serial Defects that are proven not to affect all like components (for example, if the RCA shows that the defect is isolated to a manufacturing error in a particular batch of components from a particular supplier) would only require remediation of the affected components.  Notwithstanding the foregoing, but subject to Buyer's approval (not to be unreasonably withheld), Seller may propose an extended period for correction of a Serial Defect; provided, however, that Seller extends the warranty period with respect to the articulated defect of the defective components during the correction period.  Notwithstanding anything to the contrary above, any warranty or procedure under this Section 7.3 shall not apply to defects that should have been discovered upon visual inspection at the time of delivery and reported to Seller within ten (10) business days of shipment pursuant to Article 3.

7.4     Warranty Service.  Only Buyer's personnel or their agents, including any operation and maintenance provider and permitted assignee of Buyer, may request warranty service.  Seller shall, at its sole discretion, repair, replace, or compensate for any Modules subject to the warranties under this Article 7.  If the compensation remedy is selected, the compensation shall be for the full market value of tier one replacement modules as of the date of defect and the original warranty shall continue in place with respect to such replacement modules.  Seller acknowledges that, due to site constraints of the Project, delivery of additional modules to Buyer will not adequately compensate Buyer for the underperformance of the Modules. Seller shall be responsible for all labor, and transportation charges related to its warranty services; provided however that after the commercial operation of the Project Seller shall only be responsible to the extent such charges exceed $10,000 in any year following the commercial operation date.  Any replacement modules provide by Seller under this Article 7 shall be compatible with the existing racking system of the Project as of the commercial operation date of the Project without any additional retrofitting or service.  Nevertheless Seller shall be entitled to deliver other comparable PV modules (different in size, color, shape and/or power output performance); provided the Seller shall consult Buyer regarding any such comparable PV module options and endeavor to mitigate any system shutdown, labor and retrofitting / materials costs associated with any such comparable PV module.

7.5     Additional Exceptions to Standard Limited Warranty.  In addition to the warranties set forth in this Article 7, the limited warranty

attached as Exhibit E is hereby amended as follows:

(a)    Chapter III, Section 2 (Exclusions and Limitations), clause (ii), is amended and restated in its entirety to provide: "The PV Modules are subjected to handling (including but not limited during transportation or storage) in a manner inconsistent with the installation manual, abuse, neglect, vandalism, vermin or accident."

(b)    Chapter III, Section 2 (Exclusions and Limitations), clause (viii), is deleted in its entirety.

(c)    Chapter IV, Section 1 (Disclaimers and Limitations of Liability), paragraph (d), is amended and restated in its entirety to provide:  "Warranty claims will be honored only if the PV Modules can be identified as being manufactured by Hanwha SolarOne by label or serial number, provided that if the label or serial number becomes illegible through no fault of Buyer the warranty claim shall still be honored if the PV Module can otherwise be identified as a Hanwha PV Module."

7.6    Seller Parent Guaranty.

By executing the signature page hereto, Hanwha SolarOne (Qidong) Co., Ltd., a limited liability company organized and existing under the laws of the People's Republic of China ("Seller Parent"), hereby guarantees the warranty obligations of Seller under this Article 7, including any exhibits referenced herein. Seller Parent waives service of process and consents to the governing law and forum as set forth in Sections 14.3 and 14.4 hereof.  Seller Parent shall execute the signature page on or before October 10, 2014.

8.    Indemnity.

8.1    Seller Indemnification.  Seller agrees to defend, indemnify and hold harmless Buyer, its subsidiaries and affiliates and its and their shareholders, directors, officers, employees, agents, successors and assigns, from and against any and all suits, claims, actions, demands, liabilities and documented and reasonable losses, damages, judgments, settlements, documented and reasonable costs and expenses (including but not limited to reasonable attorneys' fees) asserted by third parties against Buyer arising out of or based upon (a) intellectual property violations in the US (per Section 8.3); and/or (b) Seller's gross negligence or willful misconduct.

8.2    Buyer Indemnification.  Buyer hereby agrees to defend Seller its subsidiaries and affiliates and their shareholders, directors, officers, employees, agents, successors and assigns from and against any and all suits, claims, actions, losses, demands, liabilities, judgments, settlements, documented and reasonable costs and expenses (including but not limited to reasonable attorneys' fees) asserted by third parties against Seller arising out of or based upon (a) any installation, operation, use or maintenance of the Modules in a manner not in accordance with the Installation Guide (or otherwise as permitted by Seller in writing); (b) Buyer's gross negligence or willful misconduct.

8.3    Intellectual Property Indemnification. Seller agrees to defend any claim that may be instituted by unaffiliated third party (not under common control or ownership with Buyer) against  Buyer, its officers, agents and employees to the extent such third party allege the infringement of any patent, invention, design, trademark, or copyright arising from the

manufacture or design of Modules sold under this Agreement, that are valid in the United States of America, and pay any final damage award therein, provided that: (i) the Modules have not been modified by or on behalf of Buyer in any manner without Seller's written approval; and (ii) Buyer has complied with the obligations set forth in section 8.4 below.   If the result of any such claim is a determination of infringement, Seller shall, at its option (a) obtain for Buyer the right to continue to use the Modules, (b) replace the Modules with non-infringing goods, or (c) modify such Modules so they are non-infringing.  Notwithstanding the foregoing, Seller shall not be responsible for any compromise or settlement made without its written consent.  The foregoing states the entire liability of Seller for the claims described herein. Seller shall not be liable, and shall not indemnify Buyer for claims related to methods of construction, plant design, and balance of system.

8.4     Indemnification Procedure. The indemnity obligations under this Article 8 are contingent upon (1) the indemnified party giving prompt written notice to the indemnifying party of any such claim, action or demand, (2) the indemnified party allowing the indemnifying party to control the defense and related settlement negotiations and (3) the indemnified party fully assisting, at the indemnifying party's expense, in the defense. Notwithstanding the foregoing, the indemnified party retains, in its sole discretion, the right to conduct its own defense (at its own cost) of any third party claims, and the indemnified party's election to conduct such independent defense shall not relieve the indemnifying party from its indemnity obligations hereunder.  The indemnified party shall not, without the indemnifying party's written consent (which

consent shall not be unreasonably withheld), settle or compromise any claim or consent to entry of any judgment related thereto, which settlement, compromise or consent adversely affects the indemnifying party.

9.     Limitations of Liability.

9.1     Consequential Damages. IN NO EVENT SHALL EITHER PARTY BE LIABLE FOR ANY SPECIAL, INCIDENTAL, INDIRECT OR CONSEQUENTIAL DAMAGES ARISING UNDER THIS AGREEMENT, EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES AND NOTWITHSTANDING ANY FAILURE OF THE ESSENTIAL PURPOSE OF THIS AGREEMENT OR ANY LIMITED REMEDY HEREUNDER.

9.2     Cap on Damages. THE LIABILITY OF EACH PARTY HEREUNDER FOR ALL CLAIMS (EXCLUDING THE BUYER'S OBLIGATIONS FOR PAYMENT OF PURCHASE PRICE) SHALL NOT EXCEED THE SUM OF BUYER'S PAYMENTS ACTUALLY RECEIVED BY THE  SELLER UNDER THIS AGREEMENT, NOTWITHSTANDING ANY FAILURE OF THE ESSENTIAL PURPOSE OF THIS AGREEMENT OR ANY LIMITED REMEDY HEREUNDER.

10.     Confidential Information.

10.1     Confidential Information. Each party agrees to maintain in confidence what it knows or has reason to know is regarded as confidential by the other party ("Confidential Information").  Confidential Information may include, but is not be limited to, trade secrets, manufacturing hardware or configuration, process development, marketing plans, pricing and other commercial terms, blueprints, techniques, processes, procedures, formulae and future Modules. The terms and conditions

8

of this Agreement are Seller's Confidential Information.

10.2     Limitations on Use.  The recipient may use the Confidential Information solely as required to perform under this Agreement.  A recipient shall not disclose the Confidential Information to any person except to its employees, agents, advisors, financing parties or consultants to whom it is necessary to disclose the Confidential Information for that use and for the development of the Project ("Representatives").  The recipient agrees that the Confidential Information will be disclosed or made available only to those of its Representatives who have agreed to receive it under terms at least as restrictive as those specified in this Agreement.  The recipient shall take reasonable measures to maintain the confidentiality of the Confidential Information, but not less than the measures it uses for its own confidential information of similar type. The recipient shall immediately give notice to the discloser of any unauthorized use or disclosure of the Confidential Information.  The recipient shall assist the discloser in remedying any such unauthorized use or disclosure of the Confidential Information.  This obligation does not apply to the extent that the recipient can demonstrate:

(a)     the disclosed information at the time of disclosure is part of the public domain;

(b)     the disclosed information became part of the public domain, by publication or otherwise, by reasons other than a breach of the provisions of this Agreement;

(c)     the disclosed information can be established by written evidence to have been in the possession of the recipient at the time of disclosure; or

(d)     the disclosed information is received from a third party without similar restrictions and without breach of this Agreement.

A disclosure of Confidential Information required by law or government agency or by a proper order of a court of competent jurisdiction will not be considered a breach of this Agreement, on condition that the recipient notifies the discloser immediately of the requirement to disclose and in any event at least ten (10) days before the required disclosure date, uses its best efforts to minimize the disclosure of such information and will consult with and assist the discloser in obtaining a protective order prior to the disclosure.

10.3     Publicity.  Neither party may use the other party's name (including any successor or assignee thereof), the Project name, or photographs of the Project or other identifying characteristics in connection with any advertising or promotional materials or activities, or in other oral, written, electronic, or other communications with or materials to third parties, without the prior written consent of the other party.

10.4     No Reverse Engineering.  Buyer acknowledges that the Modules incorporate valuable trade secrets of Seller. Buyer shall not reverse engineer, disassemble or modify the Modules (in whole or in part), nor shall Buyer permit any third party to do so.  If the foregoing prohibition against reverse engineering violates applicable local law, then Buyer shall notify Seller in writing at least ninety (90) days prior to any proposed action in contravention of this provision and must meet with Seller to discuss the scope of any necessary reverse engineering permitted under local law.

11.     Termination.

11.1     Term.  This Agreement commences on the Effective Date and will terminate the later of one year after the effective date and the date all Modules are delivered, unless terminated earlier as provided in Section 11.2 below.

11.2     Termination.  This Agreement will terminate as provided below.

(a)     Each Party may, at its discretion, upon written notice to the other Party, and in addition to its rights and remedies provided under this Agreement, terminate immediately this Agreement in the event of any of the following:

(1)     either party gives the other notice of a material breach by the other of any term or condition of this Agreement, together with sufficient evidence proving such breach and the other party fails to remedy or start to remedy such breach within thirty (30) days upon receipt of such notice;

(2)     a receiver is appointed for the other party or its property;

(3)     the other party becomes insolvent or unable to pay its debts as they mature in the ordinary course of business or makes an assignment for the benefit of its creditors; or

(4)     any proceedings are commenced against the other party under any bankruptcy, insolvency or debtor's relief law and such proceedings are not vacated or set aside within sixty (60) days from the date of commencement thereof.

(b)     Seller may, at its discretion, upon written notice to Buyer, and in addition to its rights and remedies provided under this Agreement, terminate immediately this Agreement in the event that (1) payment is overdue for more than thirty (30) calendar days after written notice of such default has been served to Buyer; or (2) Buyer transfers the Modules to a third party except to a permitted assignee under this Agreement; (3) Buyer or Buyer's parent (i.e., Hanergy Holding Group Ltd.) breaches any of its obligation under the parent company guarantee entered into pursuant to section 6.4 of this Agreement .

11.3     Effect of Termination.  After termination:

(a)     If Buyer terminates this Agreement for cause, all orders not produced upon the date of termination shall be cancelled and the 10% deposit (or remaining portion with respect to undelivered Modules) shall be returned to Buyer.  Subject to Section 11.3(b), if Seller terminates this Agreement for cause, Buyer will (i) remain liable for the entire purchase price of the Modules and any and all damages, losses and expenses (including but not limited to attorney fees) incurred by Seller which arise out of or in connection with such termination or breach of contract by Buyer; and (ii) be obligated to pay Seller liquidated damages in an amount equaling 10% of the contract price for the Committed Quantity and the Additional Quantity, and such amount shall be immediately due and payable pursuant to Section 11.3(d);

(b)     Buyer will be entitled to have delivered the Modules ordered prior to termination on a letter of credit, C.O.D., or cash in advance basis;

(c)     Buyer shall return or destroy all copies of the Confidential Information within thirty (30) days after the effective date of the termination.  At the request of Seller, the

president or the equivalent officer of Buyer shall certify in writing that Buyer has complied with its obligations hereunder;

(d)     All sums owed to Seller by Buyer shall become immediately due and payable upon the effective date of termination (even if longer terms have been provided); and

(e)     Neither Seller nor Buyer shall be liable to the other because of such expiration or termination, for compensation, reimbursement or damages for the loss of prospective profits, anticipated sales or goodwill, on account of any expenditures, investments or commitments made by either, or for any other reason whatsoever based upon the result of such expiration or termination.

11.4     Survival.  The provisions of this Agreement that by their nature continue and survive will survive any expiration or termination of this Agreement, along with those of the following Sections: 4, 5, 6, 7, 8, 9, 10, 11.3, this 11.4, 12 and 14.

12.     Assignment.

12.1     Assignment Generally.  Except as provided herein, neither party may assign any of its rights under this Agreement, except with the prior written consent of the other party. This Agreement will bind and inure to the benefit of the parties and their respective successors and permitted assigns.

12.2     Permitted Buyer Assignment.  Buyer with written notice to Seller may (a) assign this Agreement to any lenders and other persons that provide construction, bridge, permanent, or other debt or equity financing with respect to the Project in connection with a financing or the grant of a security interest to such party; provided if this Agreement assigned prior to the

payment of the Purchase Price then Buyer shall remain jointly and severally liable to Seller with respect to payment of purchase price); and (b) after payment in full of the Purchase Price, assign this Agreement and the warranties hereunder in its sole discretion.  The warranties hereunder shall only apply so long as the Modules remain in their original location of installation.

13.     Representations and Warranties.

13.1     Seller Representations and Warranties. Seller hereby represents, warrants and covenants to Buyer that, as of the Effective Date (or such other date as indicated below):

(a)     It is a California corporation, duly incorporated and validly existing, and in good standing under the laws of the State of California, and has full power to engage in the business it presently conducts and contemplates conducting under this Agreement, which the nature of the business transacted by it makes such licensing or qualification necessary and where the failure to be licensed or qualified;

(b)     This Agreement has been duly executed and delivered by it and constitutes the legal, valid, binding and enforceable obligation of Seller;

(c)     At the time title to the Modules passes to Buyer pursuant to Article 2, (i) Buyer shall have good and marketable title to the Modules free and clear of all liens, and (ii) no component part of the Modules shall be the subject of any retention of title in favor of any supplier thereof;

(d)     The Modules shall be manufactured by in Qidong, China, and upon reasonable request of Buyer (on behalf of its agents and financing

11

parties) Seller shall provide reasonable access and inspection of such facility during production of the Modules;

(e)      The Modules have, or will at the time of delivery, the UL and/or CEC approvals and certifications as set forth in the specifications; and

(f)      There are no actions, suits, proceedings, patent or license infringements or investigations pending or, to its knowledge, threatened against it before any court or arbitrator that individually or in the aggregate could result in any materially adverse effect on the business, properties or assets or the condition, financial or otherwise, of Seller or in any impairment of its ability to perform its obligations under this Agreement.

13.2      Buyer Representations and Warranties. Buyer hereby represents, warrants and covenants to Seller that, as of the Effective Date (or such other date as indicated below):

(a)      It is a California corporation, duly incorporated and validly existing, and in good standing under the laws of the State of California, and has full power to engage in the business it presently conducts and contemplates conducting under this Agreement, which the nature of the business transacted by it makes such licensing or qualification necessary and where the failure to be licensed or qualified;

(b)      This Agreement has been duly executed and delivered by it and constitutes the legal, valid, binding and enforceable obligation of Buyer; and

(c)      Except for those that have been disclosed publicly or to Seller, there are no actions, suits, proceedings, patent or license

infringements or investigations pending or, to its knowledge, threatened against it before any court or arbitrator that individually or in the aggregate could result in any materially adverse effect on the business, properties or assets or the condition, financial or otherwise, of Buyer or in any impairment of its ability to perform its obligations under this Agreement

14.      General.

14.1      Waiver. Any waiver of any right under this Agreement shall be effective only by a writing executed by the party or parties against whom the waiver is sought to be enforced. No failure or delay in exercising any right or remedy, or in requiring the satisfaction of any condition under this Agreement, and no act, omission or course of dealing between the parties, shall operate as a waiver or estoppel of any right, remedy or condition. A waiver made in writing on one occasion is effective only in that instance and only for the purpose stated. A waiver once given is not to be construed as a waiver on any future occasion or against any other person.

14.2      Severability. If any part of this Agreement is found invalid or unenforceable, that part will be amended to achieve as nearly as possible the same economic effect as the original provision and the remainder of this Agreement will remain in full force.

14.3      Choice of Law. The laws of California govern all matters arising out of or relating to this Agreement, without regard to conflict of laws rules thereof. The parties agree that the United Nations Convention on Contracts for the International Sale of Goods (1980) is specifically excluded from application to this Agreement.

14.4 _Dispute Resolution and Attorney's Fees_. All disputes not otherwise resolved between Seller and Buyer shall be resolved in a court of competent jurisdiction located in San Francisco County, California.   The prevailing party in any litigation arising out of this Agreement shall be entitled to recover from the other party all costs and expenses of such litigation including reasonable attorney's fees.

14.5 _Notices_. Each party giving or making any notice, request, demand or other communication (each, a "Notice") pursuant to this Agreement shall give the Notice in writing and use one of the following methods of delivery, each of which for purposes of this Agreement is a writing:  personal delivery, registered or certified mail (in each case, return receipt requested and postage prepaid), or internationally recognized overnight courier (with all fees prepaid). Any party giving a Notice shall address the Notice to the appropriate person at the receiving party (the "Addressee") at the address set forth below or to another Addressee or another address as designated by a party in a Notice given pursuant to this Section.

If to Seller:   Hanwha SolarOne USA Inc.
2424 Walsh Ave.
Santa Clara, CA 95051
Attn: Planning Team

If to Buyer:   Columbia Solar Energy, LLC
c/o Hanergy America Solar Solutions
1350 Bayshore Hwy, Suite 825
Burlingame, CA 94010
Attn.: Legal

Except as provided elsewhere in this Agreement, a Notice is effective only if the party giving the Notice has complied with the above requirements of this Section and the Addressee has received the Notice.

14.6 _Entire Agreement_. This Agreement constitutes the final agreement between the parties.  It is the exclusive expression of the parties' agreement on the matters contained in this Agreement. All earlier and contemporaneous negotiations and agreements between the parties on the matters contained in this Agreement are expressly merged into and superseded by this Agreement.  Any purchase orders, except for the purchase order referenced in Section 2.1 hereof relating to Additional Quantity, issued by Buyer for the Modules shall be for informational and scheduling purposes only.  The terms and conditions of Buyer's purchase orders are of no force or effect and all sales of the Modules are and will be controlled by the terms of this Agreement.

14.7 _Amendment_.  The parties may amend this Agreement only by a written agreement of the parties that identifies itself as an amendment to this Agreement.

14.8 _Allocation of Risk_.  The sections on limitation of liability, warranties and disclaimer of warranties allocate the risks in the Agreement between the parties.  This allocation is reflected in the pricing of the Modules and is an essential element of the basis of the bargain between the parties.

14.9 _Force Majeure_.  Except for the payment of money, neither party will be liable for any failure or delay in performance under this Agreement that might be due, in whole or in part, directly or indirectly, to any contingency, delay, failure, or cause of, any nature beyond the reasonable control of such party, including fire, explosion, earthquake, storm, flood or

other weather, strike or lockout that are regional in nature (including regional transportation), activities of a combination of workmen or other labor difficulties, war, act of terrorism, insurrection, riot, act of God or the public enemy.  In the event of the happening of such a cause, the party whose performance is so affected will give written notice to the other party, stating the period of time the same is expected to continue.  The delay will not be excused under this Section for more than one hundred eighty (180) days.

14.10    English Language. This Agreement has been prepared and executed in the English language only, which language shall be controlling in all respects.  Any translations of the provisions of this Agreement into any other language are for reference only and shall have no legal or other effect.  Any notice that is required or permitted to be given by one party to the other under this Agreement must be in the English language and in writing.  All proceedings related to this Agreement will be conducted in the English language.

14.11    Counterparts.  This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

[signature page to follow]

14

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first set forth above.

Seller:                                          BUYER:

Hanwha SolarOne USA Inc.:          Hanergy USA Solar Solution Ltd.:

By:_____          By:_____
Name:                                            Name: Yi Wu
Title:                                             Title: CEO

For purposes of Article 7 only:

Hanwha SolarOne (Qidong) Co., Ltd.

By:_____
Name:

Title:

[SIGNATURE PAGE TO MODULE SUPPLY AGREEMENT]

**EXHIBIT A**

**MODULE MODEL AND PURCHASE PRICE**

**Quantity:**

**Committed Quantity - 25,634,515  Wp (DC) of Modules:**

| Model | Nominal Power Rating | Price/Wp (USD): | Units: |
|---|---|---|---|
| HSL72P6-PB-4 | 300Wp | $ | 16,861 |
| HSL72P6-PB-4 | 305Wp | $ | 67,463 |

Seller have the right to supply either HSL72P6-PB-4 or HSL72P6-PC-3 (in each case in the same power class distribution as set forth above), upon written consent of Buyer to be agreed upon in the issuance of the purchase order on or prior to October 10, 2014.

If Seller supplies with the model of HSL72P6-PC-3, price of such amount of modules will be $       per Wp.

**Additional Quantity – Up to 200,000 Wp (DC) of Modules:**

Seller agrees that no less than 70% of the Additional Quantity Modules shall be rated at 305 Wp, and the remaining Modules shall be rated at 300 Wp.

**Purchase Price:**

- Modules: $                    ıclusive of shipping to the Delivery Point)

16

**EXHIBIT B**

**MODULE SPECIFICATIONS**

[attached]

**HSL 72 | Poly UL**

# Hanwha Solar



## Five Key Features

1 Guaranteed quality: 12 year product warranty, 25 year linear performance warranty *

2 Predictable output: Positive power sorting of 0 to + 5 W

3 Innovation solutions: UL certified up to 1000V for optimized system designs

4 Robust design: certified to withstand up to 4000 Pa wind load and up to 7000 Pa snow load**

5 Tariff free: High performance Taiwan cells

\* Please refer to Hanwha Solar Product Warranty for details
\*\* Please refer to Hanwha Solar Module Installation Guide

## Quality and Environmental Certificates

- ISO 9001 quality standards and ISO 14001 environmental standards
- OHSAS 18001 occupational health and safety standards
- UL 1703 600V and 1000V certification
- CEC listed



## About Hanwha Solar

Hanwha Solar is a vertically integrated manufacturer of photovoltaic modules designed to meet the needs of the global energy consumer.

- High reliability, guaranteed quality, and excellent cost-efficiency due to vertically integrated production and control of the supply chain;
- Optimization of product performance and manufacturing processes through a strong commitment to research and development;
- Global presence throughout Europe, North America and Asia, offering regional technical and sales support.



Hanwha Solar

## HSL 72 | Poly UL

## Electrical Characteristics

### Electrical Characteristics at Standard Test Conditions (STC)

| Power Class | 280 W | 285 W | 290 W | 295 W | 300 W | 305 W |
|---|---|---|---|---|---|---|
| Maximum Power ($P_{max}$) | 280 W | 285 W | 290 W | 295 W | 300 W | 305 W |
| Open Circuit Voltage ($V_{oc}$) | 44.6 W | 44.8 W | 45.1 W | 45.3 W | 45.5 W | 45.7 W |
| Short Circuit Current ($I_{sc}$) | 8.43 A | 8.53 A | 8.57 A | 8.65 A | 8.72 A | 8.80 A |
| Voltage at Maximum Power ($V_{mpp}$) | 35.7 V | 35.9 V | 36.2 V | 36.4 V | 36.5 V | 36.7 V |
| Current at Maximum Power ($I_{mpp}$) | 7.85 A | 7.95 A | 8.02 A | 8.12 A | 8.22 A | 8.32 A |
| Module Efficiency (%) | 14.5 % | 14.7 % | 15.0 % | 15.3 % | 15.5 % | 15.8 % |

$P_{max}$, $V_{oc}$, $I_{sc}$, $V_{mpp}$, and $I_{mpp}$ tested at STC defined as irradiance of 1000 W/m² at AM 1.5 solar spectrum and temperature 25 ± 2 °C.
Module power class have positive power sorting: 0 to +5W. Electrical Characteristics: measurement tolerance of ± 3 %.

### Electrical Characteristics at Normal Operating Cell Temperature (NOCT)

| Power Class | 280 W | 285 W | 290 W | 295 W | 300 W | 305 W |
|---|---|---|---|---|---|---|
| Maximum Power ($P_{max}$) | 203 W | 207 W | 210 W | 214 W | 218 W | 222 W |
| Open Circuit Voltage ($V_{oc}$) | 41.5 W | 41.7 W | 41.9 W | 42.1 W | 42.3 W | 42.5 W |
| Short Circuit Current ($I_{sc}$) | 6.81 A | 6.89 A | 6.92 A | 6.98 A | 7.04 A | 7.11 A |
| Voltage at Maximum Power ($V_{mpp}$) | 32.2 V | 32.4 V | 32.7 V | 32.9 V | 33.0 V | 33.2 V |
| Current at Maximum Power ($I_{mpp}$) | 6.31 A | 6.39 A | 6.43 A | 6.51 A | 6.61 A | 6.69 A |
| Module Efficiency (%) | 13.1 % | 13.4 % | 13.6 % | 13.8 % | 14.1 % | 14.4 % |

$P_{max}$, $V_{oc}$, $I_{sc}$, $V_{mpp}$, and $I_{mpp}$ tested at NOCT defined as irradiance of 800 W/m²; wind speed 1 m/s.
Electrical Characteristics: measurement tolerance of ± 3 %.

### Temperature Characteristics

| | |
|---|---|
| Normal Operating Cell Temperature (NOCT) | -40°C to +85°C |
| Temperature Coefficients of P | -0.43%/°C |
| Temperature Coefficients of V | -0.32%/°C |
| Temperature Coefficients of I | +0.05%/°C |

### Maximum Ratings

| | |
|---|---|
| Maximum System Voltage | 600V or 1000V (UL) |
| Series Fuse Rating | 15 A |
| Maximum Reverse Current | Series fuse rating multiplied by 1.35 |

## Mechanical Characteristics

| | |
|---|---|
| Dimensions | 1956 mm × 988 mm × 45 mm |
| Weight | 27±0.5kg |
| Frame | Aluminum alloy, available in silver or black finish |
| Front | Tempered glass |
| Encapsulant | EVA |
| Back Cover | White or black back sheet |
| Cell Technology | Polycrystalline (Taiwan) |
| Cell Size | 156 mm × 156 mm (6in ×6in) |
| Number of Cells (Pieces) | 72 (6 × 12) |
| Junction Box | Protection class IP67 with bypass-diode |
| Output Cables | Solar cable: 4 mm²; length 1200 mm |
| Connector | Amphenol H4 |

## System Design

| | |
|---|---|
| Operating Temperature | – 40 °C to 85 °C |
| Hail Safety Impact Velocity | 25 mm at 23 m/s |
| Fire Safety Classification (IEC 61730) | Class C |
| Static Load Wind/Snow | 4000Pa/7000Pa |

## Packaging and Storage

| | |
|---|---|
| Storage Temperature | – 40 °C to 85 °C |
| Packaging Configuration | 22 pieces per pallet |
| Loading Capacity (40 ft. HQ Container) | 484    pieces |

Nomenclature

eg. HSL72P6-PB-0-245TW

HSL72P6-PB-_-xxx

| Code | Certification | Code | Frame / Backsheet |
|---|---|---|---|
| 0 | 600 V (UL) | T | Silver / White |
| 4 | 1000 V (UL) | TW | Black / White |
| | | TB | Black / Black |

xxx  represents the power class

Performance at Low Irradiance:
The typical relative change in module efficiency at an irradiance of 200 W/m² in relation to 1000 W/m² (both at 25 °C and AM 1.5 spectrum) is less than 5 %.

Various Irradiance Levels



Basic Design



BACK VIEW


Mounting holes


Drainage holes


Grounding holes


Section A-A



**HSL 72S**
4BB 72 Cell Poly Module

# Hanwha Solar



# Key Features

**Anti-PID**
Qualified to Withstand PID (Potential Induced Degradation) *

**Guaranteed Quality**
12 Year Workmanship, 25 Year Linear Performance Warranty **

**Predictable Output**
Positive Power Sorting, 0 to +5 Watt

**Innovative Technology**
4BB Cell, Improved Module Efficiency and Power

**Harsh Environment Resistance**
Verified against Salt Mist and Ammonia Corrosion

**Better Performance**
Improved Low Light Irradiance Performance and TCOE

**Efficient Logistics**
Compact Design, Efficient Shipping, Easy Handling

\* PID test conditions : module charged -1000V with Al-foil covered
   surface, 25 C, 168h
\*\* Please refer to Hanwha Solar Product Warranty for details

## Quality and Environmental Certificates

- ISO 9001 quality standards and ISO 14001 environmental standards
- OHSAS 18001 occupational health and safety standards
- UL 1703 1000V certification
- Conformity to CE

 

CEC
Listed

## About Hanwha Solar

Hanwha Solar is a vertically integrated manufacturer of photovoltaic modules designed to meet the needs of the global energy consumer.

- High reliability, guaranteed quality, and excellent cost-efficiency due to vertically integrated production and control of the supply chain
- Optimization of product performance and manufacturing processes through a strong commitment to research and development
- Global presence throughout Europe, North America and Asia, offering regional technical and sales support



# HSL 72S
## 4BB 72 Cell Poly Module

## Electrical Characteristics

### Electrical Characteristics at Standard Test Conditions (STC)

| Power Class | 290 W | 295 W | 300 W | 305 W | 310 W | 315 W |
|---|---|---|---|---|---|---|
| Maximum Power ($P_{max}$) | 290 W | 295 W | 300 W | 305 W | 310 W | 315 W |
| Open Circuit Voltage ($V_{oc}$) | 44.4 V | 44.6 V | 44.8 V | 45.0 V | 45.1 V | 45.3 V |
| Short Circuit Current ($I_{sc}$) | 8.49 A | 8.60 A | 8.70 A | 8.81 A | 8.91 A | 9.02 A |
| Voltage at Maximum Power ($V_{mpp}$) | 36.2 V | 36.4 V | 36.6 V | 36.8 V | 37.1 V | 37.3 V |
| Current at Maximum Power ($I_{mpp}$) | 8.02 A | 8.11 A | 8.20 A | 8.29 A | 8.36 A | 8.45 A |
| Module Efficiency (%) | 14.8 % | 15.1 % | 15.3 % | 15.6 % | 15.8 % | 16.1 % |

$P_{max}$, $V_{oc}$, $I_{sc}$, $V_{mpp}$ and $I_{mpp}$ tested at Standard Testing Conditions (STC) defined as irradiance of 1000W/m² at AM 1.5 solar spectrum and a temperature of 25±2°C. Module power class have positive power sorting: 0 to +5W. Measurement tolerance: +/- 3% ($P_{max}$)

### Electrical Characteristics at Nominal Operating Cell Temperature (NOCT)

| Power Class | 290 W | 295 W | 300 W | 305 W | 310 W | 315 W |
|---|---|---|---|---|---|---|
| Maximum Power ($P_{mpp}$) | 213 W | 217 W | 221 W | 224 W | 228 W | 231 W |
| Open Circuit Voltage ($V_{oc}$) | 41.6 V | 41.8 V | 42.0 V | 42.2 V | 42.3 V | 42.4 V |
| Short Circuit Current ($I_{sc}$) | 6.86 A | 6.95 A | 7.03 A | 7.12 A | 7.20 A | 7.29 A |
| Voltage at Maximum Power ($V_{mpp}$) | 33.3 V | 33.5 V | 33.6 V | 33.8 V | 34.1 V | 34.4 V |
| Current at Maximum Power ($I_{mpp}$) | 6.40 A | 6.48 A | 6.58 A | 6.63 A | 6.69 A | 6.81 A |
| Module Efficiency (%) | 13.6 % | 13.9 % | 14.1 % | 14.3 % | 14.6 % | 15.0 % |

$P_{mpp}$, $V_{oc}$, $I_{sc}$, $V_{mpp}$ and $I_{mpp}$ tested at Nominal Operating Cell Temperature (NOCT) defined as irradiance of 800W/m²; 20°C; Wind speed 1m/s. Measurement tolerance: +/- 3% ($P_{max}$)

### Temperature Characteristics

| | |
|---|---|
| Normal Operating Cell Temperature (NOCT) | 45°C + / - 3°C |
| Temperature Coefficients of Pmax | - 0.41 % / °C |
| Temperature Coefficients of Voc | - 0.31 % / °C |
| Temperature Coefficients of Isc | + 0.055 % / °C |

### Maximum Ratings

| | |
|---|---|
| Maximum System Voltage | 1000 V (UL) |
| Series Fuse Rating | 15 A |
| Maximum Reverse Current | Series fuse rating multiplied by 1.35 |

## Mechanical Characteristics

| | |
|---|---|
| Dimensions | 1972mm ×992mm ×40 mm |
| Weight | 23±0.5kg |
| Frame | Aluminum-alloy |
| Front | 3.2mm tempered glass with anti reflective coating |
| Encapsulant | EVA |
| Back Cover | Composite sheet |
| Cell Technology | 4 busbar Polycrystalline |
| Cell Size | 156 mm × 156 mm (6 in × 6 in) |
| Number of Cells (Pieces) | 72 (6 × 12) |
| Junction Box | Protection class IP 67 |
| Output Cables | Solar cable: 4 mm²; length: 1200 mm |
| Connector | Amphenol H4 |

## System Design

| | |
|---|---|
| Operating Temperature | - 40 °C to 85 °C |
| Hail Safety Impact Velocity | 25 mm at 23 m/s |
| Fire Safety Classification (IEC 61730) | Class C |
| Static Load Wind / Snow | 4000Pa/5400Pa |

## Packaging and Storage

| | |
|---|---|
| Storage Temperature | - 40 °C to 85 °C |
| Packaging Configuration | 25 pieces per pallet |
| Loading Capacity (40 ft. HQ Container) | 550 pieces |

Nomenclature:
Full product name:
HSL72P6-PC-3-xxx
xxx represents the power class

Performance at Low Irradiance:
The typical efficiency at 200 W/m² in relation to 1000 W/m², (25°C, AM 1.5) is at least 97 % of STC efficiency.



Various Irradiance Levels





Mounting holes    Drainage holes



Grounding holes    Section A-A


Hanwha Solar

©Hanwha SolarOne Co., Ltd. Specifications are subject to change without notice. Release: 2014-09-01

EXHIBIT C

SHIPMENT SCHEDULE

**Committed Quantity:**

Shipment Date

| Quantity (MW DC) | Shipment Date* |
|---|---|
| 6.40862875 | December 8 – 12, 2014 |
| 6.40862875 | December 17 – 23, 2014 |
| 6.40862875 | January, 12 – 16, 2015 |
| 6.40862875 | January, 26 – 30, 2015 |

*Each delivery sequence will span throughout five working days, in which an equal amount of Modules will come each day.

**Additional Quantity:**

The parties shall negotiate the delivery terms of the Additional Quantity, if any, which shall be delivered on a date not earlier than March 1, 2015.

**EXHIBIT D**

**INSTALLATION GUIDE**

**[attached]**





# Installation
Guide

HSL Poly Series

Hanwha Solar

2

# CONTENT



INTRODUCTION                    3

PURPOSE OF THIS GUIDE           3

SYSTEM DESIGN                   4

MOUNTING INSTRUCTIONS           5

ELECTRICAL INSTALLATION         8

ADDITIONAL INFORMATION          10

DISCLAIMER OF LIABILITY

The installation techniques, handling and use of the product are beyond company control. Therefore, Hanwha Solar
assumes no responsibility for loss, damage or expense resulting from improper installation, handling or misuse.
Ensure that the module is used only in applications for which it is suitable (see "Mounting Instructions"). All work on a PV
system (installation, setup, maintenance) must be carried out only by appropriately qualified and authorized engineers.
The appropriate local standards, construction rules and safety instructions must be followed during installation.



# INTRODUCTION

Hanwha Solar is a leading manufacturer of silicon ingots, wafers, PV cells and modules, delivering reliable products at competitive pricing on a global scale. We provide world-class PV technology, efficient manufacturing, and local customer support. We are committed to providing technical and installation support for our customers worldwide. This Installation Guide covers installation of the following Hanwha Solar modules:

**IEC Products**

HSL60P6-PB-1-xxx (W/B)
HSL72P6-PB-1-xxx (W/B)

**UL Products**

HSL60P6-PB-0-xxxT  (W/B)
HSL60P6-PB-2-xxxQ  (W/B)
HSL60P6-PB-3-xxxQ  (W/B)
HSL60P6-PB-4-xxxQ  (W/B)
HSL60P6-PB-4-xxxT  (W/B)
HSL72P6-PB-0-xxxT  (W/B)
HSL72P6-PB-2-xxxQ  (W/B)
HSL72P6-PB-3-xxxQ  (W/B)
HSL72P6-PB-4-xxxQ  (W/B)
HSL72P6-PB-4-xxxT  (W/B)

＊xxx represents the power class

# PURPOSE OF THIS GUIDE

This guide contains important information regarding the installation, safe handling and maintenance of photovoltaic modules made by Hanwha Solar. The word "module" as used in this guide refers to one or more PV modules. All instructions should be read and understood prior to installing the modules. The installer should conform to all the safety precautions in this guide when installing the modules. Local standards and regulations should also be followed during installation. Before installing a photovoltaic system, the installer must be familiar with the mechanical and electrical requirements for such a PV system. Keep this guide in a safe place for future reference. Hanwha Solar provides technical support worldwide. Visit www.hanwha-solarone.com for contact information.



# SYSTEM DESIGN

Before installing your solar system, contact local authorities to determine the necessary permit, installation and inspection requirements that must be followed. System should be installed by qualified personnel only. The system involves electricity, and can be dangerous if the personnel are not familiar with the appropriate safety procedures. PV modules should be mounted in a location where they will receive maximum sunlight throughout the year. Specially, in the northern hemisphere, the modules should face south. And in the southern hemisphere, the modules should face north.

- In order to achieve maximum annual yield, optimum orientation and tilt of PV module is necessary. Sunlight shining vertically and completely onto PV module is the best condition to generate maximum power.

- Artificially concentrated sunlight shall not be directed on the module. Very hot module(s) can reduce power output performance. Ensure the module has good ventilation conditions to prevent overheating.

- Site-specific environment loads such as wind and snow should be taken into account to avoid exceeding the maximum load.

- When designing the system, please pay attention to the total voltage (if connected in series) and current (if connected in parallel).

- You must not install more than three (3) modules in parallel without additional string fuses or string diodes. While in series, the open circuit voltage of the string must not exceed the allowed maximum system voltage (e.g. 1000Vdc for IEC certified systems), even under cold climate conditions.

- The module must not be installed close to fire or flammable materials. Completely cover the module with an opaque material during installation to prevent electricity from being generated.

- Supplementary: If system grounding is required by system configuration or local authorities, Hanwha SolarOne recommends negative system grounding which could have positive effect on system performance.

5

# MOUNTING INSTRUCTIONS

The basis for durable and safe mounting is an assembly frame which corresponds to the appropriate structural requirements, which is securely anchored to the ground, to the roof, or to a façade, and whose long-term stability is guaranteed. The mounting structure and the module attachments must be designed in accordance with the local wind and snow loads. Ensure that the modules are mounted over a fire resistant roof covering rated for the application. To prevent bending, vibration, mechanical stress or warpage, mount the module onto a flat contact surface.

- Always secure the module with the correct number of clamps or screws or use appropriate mounting rails
- The distance between modules should be selected carefully respecting thermal expansions. In no way modules should touch each other at any operating temperature to avoid unfavorable forces. Keep in mind, different modules, mounting systems, and building materials do have different thermal expansion coefficients. Hanwha Solar recommends a minimum distance of 20 mm between modules
- Avoid direct contact between glass and metal (e.g. mounting rails)
- Modules can be installed in both landscape and portrait modes. Reduced snow loads may apply, depending on mounting method
- For portrait installations, the junction box should be located in the upper area of the module and the cables should hang downwards
- Recommended tightening torque: 10Nm for bolt mounting and clamp mounting unless otherwise specified by mounting system provider
- Do not drill additional holes for installation (drilling holes shall void product warranty)
- Module clamps must not overlap the glass or shade the module surface
- The installation and attachment materials (nuts, bolts, etc.) must be corrosion-resistant

Bolt Mounting Details



Clamp Mounting Details



**6**

# MOUNTING INSTRUCTIONS

**IEC Products**

HSL60P6-PB-1-xxx (W/B)

**UL Products**

HSL60P6-PB-0-xxxT  (W/B)

HSL60P6-PB-2-xxxQ  (W/B)

HSL60P6-PB-3-xxxQ  (W/B)

HSL60P6-PB-4-xxxQ  (W/B)

HSL60P6-PB-4-xxxT  (W/B)



7



**IEC Products**

HSL72P6-PB-1-xxx (W/B)

**UL Products**

HSL72P6-PB-0-xxxT   (W/B)
HSL72P6-PB-2-xxxQ   (W/B)
HSL72P6-PB-3-xxxQ   (W/B)
HSL72P6-PB-4-xxxQ   (W/B)
HSL72P6-PB-4-xxxT   (W/B)

**8**

# ELECTRICAL INSTALLATION

## CORRECT WIRING SCHEME

To minimize the risk of an indirect lightning strike, avoid forming closed loops when designing the system. Check that wiring is correct before starting the generator. If the measured open circuit voltage ($V_{oc}$) and short-circuit current ($I_{sc}$) differ from the specifications, there may be a wiring fault.

## SOLAR MODULE PLUG CONNECTORS

All solar modules are equipped with solar cables with 4-6mm$^2$ serving a temperature range from -40°C to 90°C. The connectors have specified polarities; they are marked with '+' and '-' signs. Make sure that the connection is safe and tight. Connectors should only be used to connect the circuit, but never used to turn the circuit on or off. Connectors must not be exposed to direct rain or laid in water drains.

## USE OF PROPER COMPONENTS

Use cable extensions and plugs that are designed for outdoor applications. Ensure that they are in good electrical and mechanical condition. Only cables with one conductor are to be used. Ensure that all materials meet the requirements of the systems' maximum voltage, current, moisture, and temperature when they are exposed to sunlight. Under normal conditions, a photovoltaic module is likely to produce more current and/or voltage than that reported under Standard Test Conditions. Accordingly, the values of $I_{sc}$ and $V_{oc}$ marked on the module should be multiplied by a factor of 1.25 when selecting electrical components voltage ratings, conductor capacities, fuse type, and type of control components connected to the PV output.

> **The maximum series fuse rating is:**
> · 10A for modules with Hanwha Solar 125x125mm cells
> · 15A for modules with Hanwha Solar 156x156mm cells

The maximum reverse current is known as series fuse rating multiplied by a factor of 1.35. Each module (or series string of modules so connected) shall be provided with the maximum series fuse as specified.
For USA:
Refer to Section 690-8 of the U.S. National Electrical Code for an additional multiplying factor of 1.25 which may be applicable.

## BYPASS DIODES

When modules in series are partially shaded, it may cause reverse voltage across cells or modules, this may cause undesirable heating to occur. The use of a diode to bypass the shaded area can minimize both heating and array current reduction. All Hanwha Solar modules are equipped with factory installed bypass diodes. The factory installed diodes provide proper circuit protection for the system.

## OTHERS

During installation, be sure to tie the cable from the junction box to the mounting substructure with nylon line, etc. to avoid direct contact of the cable with the back surface of the module.

9

## GROUNDING

The frame shall be grounded in accordance with local electrical requirements*. If grounding of the modules is required, a good connection between modules and the grounding hardware is essential for an effective ground. The anodization on a module frame provides a coating to minimize the corrosion due to weather and it acts as a barrier that reduces the effectiveness of the grounding connection. For an adequate electrical connection, the grounding hardware should penetrate the anodized layer.

* For UL Products: Only UL listed equipment should be used for bonding to ground. For USA: National electrical code (NEC) Article 250; for Canada: CEC

In case grounding is required, Hanwha Solar recommends using the follow components or equivalents.

Option 1: Bolting ground




Option 2: Grounding lug with machine screw at frame hole



Nut
Serrated washer
Module frame
Lay-in lug
Flat washer
Machine screw

Select a grounding lug listed for direct burial and outdoor use (tin-plated, solid copper lay-in lug with a stainless-steel set screw) capable of accepting a 4-14 AWG copper conductor. Secure the lug to module grounding hole with a stainless steel machine screw, flat washer, serrated washer and nut. Tighten the nut to approximately 2.26 N-m (20 in-lbs). Tighten the lug set screw to the copper wire at the torque specified by lug manufacturer.

① Stainless steel bolt M4 × 30 ② Stainless steel nut M4 ③ Stainless steel flat washer M4
④ Stainless steel spring washer M4 ⑤ Stainless steel lock-toothed washer M4 ⑥ Stainless steel slotted washer M4

## IEC/EN61730 INFORMATION

Hanwha Solar module is designed to fulfill the criteria of Application Class A requirements according to IEC/EN61730-part1. The modules are qualified for application class A: Hazardous voltage (IEC61730: higher than 50V DC; EN61730: higher than 120V), hazardous power applications (higher than 240W) where general contact access is anticipated (Modules qualified for safety through EN IEC61730-1 and EN IEC61730-2 within this application class are considered to meet the requirements for Safety Class II.

## UL LISTING INFORMATION

1. Rated electrical characteristics are within 10% of measured values at Standard Test Conditions of: 1000W/ m², 25°C cell temperature and solar spectral irradiance per ASTM E892 or irradiance of AM 1.5 spectrum.
2. The standoff height should be at least 7.9 in. If other mounting means are employed, this may affect the UL Listing.
3. The modules have been evaluated by UL for a maximum positive or negative design loading of 30 lbs/ft².
4. Wiring methods should be in accordance with the NEC.
5. For installations in Canada, the installation shall also be in accordance with CSA C22.1, safety Standards for Electrical Installations, Canadian Electrical Code, Part 1.
6. The use of the following hardware is required in order to provide a reliable grounding connection to the module frame: a combination of the following stainless steel hardware: Serrated washer, Spring washer, flat washer, a size M4 nut, and bolt M4x30mm -- (see illustration grounding for details).

10

# ADDITIONAL INFORMATION

**WARNING!**

PV modules generate electricity as soon as they are exposed to sunlight. One module generates a safe, extra-low voltage level, but multiple modules connected in series (summing the voltage) or in parallel (summing the current), represent a danger. The following points must be noted when handling the solar modules to avoid the risk of fire, sparking, and fatal electric shock.

 Do not insert any electrically conductive materials into the plugs or sockets.

 Do not fit PV modules and wiring with wet plugs and sockets.

 Make sure to use proper safety equipment (insulating tools and gloves, etc.) when wiring.

 Make sure that the connection is made when the circuit is cut off.
Do not disconnect under load.

 To avoid the generation of an electric arc, ensure the connectors are clean and have not been contaminated,and that the electrical connection and mechanical joint are good.

**UNPACKING AND STORING MODULES**

Utmost attention is required when handling module(s). The following guidelines should be followed with caution while unpacking, transporting, and storing the modules:

 Open the packaging with care, especially when handling sharp blades. Lift the modules out of carton box with two or more persons.

 Do not strike or physically damage the module.

 Carry modules with proper method in order to avoid module breakage. Using both hands is recommended. Do not use the junction box or the cables as a handle.

 Place the module with proper support. Do not place modules on top of each other. Do not twist the module.

 Do not stand on the module.

 Do not mark the rear of the module using sharp objects.

**11**

## NORMAL OPERATING CONDITIONS FOR HANWHA SOLAR MODULES

### Operating conditions

- The operating temperature of PV module should be within -40°C to 85°C (-40°F to 185°F).
- Ensure adequate ventilation behind the module, especially in hot environments.
- Module should be installed at least 500m from the sea to avoid corrosion due to exposure to salt.
- Other sources of corrosion, including sulfur (from sulfur sources such as volcanoes), can also lead to performance degradation and should be avoided.

### Location conditions

The following location conditions should be avoided when installing a module:

- Location with potential for extreme sand and dust damage.
- Location with extreme air pollution, chemical vapors, acid rain, and/or soot, etc.
- Location with extreme hail and/or snow.
- Location with potential extreme salt damage.

## MAINTENANCE AND CARE

Dirt on the surface of the solar module may decrease power generation. Keep module surface free from any dirt which potentially shades the cells. An at least 10 degree inclination supports the self-cleaning function of the glass. If you still need to clean the module or if soiling on the module glass becomes excessive, use a soft cloth and water for cleaning.

CAUTION: DO NOT USE ABRASIVE DETERGENTS

Please consult with system designer to decide the cleaning frequency according to local environmental conditions. Once a year, check the electrical and mechanical devices to ensure every connection is tight. The system must be periodically inspected.

CERTIFICATIONS

**International Product Safety Certifications**

   

TÜV, CE, UL, and Safety Class II certifications ensure that Hanwha Solar's products operate safely and comply with electrical and fire safety codes around the world.

**International Product Performance Certifications**



IEC Certification ensures our products' performance and reliability.

**International Quality Manufacturing Certifications**



ISO 9001, OHSAS 18001, and TÜV factory inspections confirm that Hanwha Solar's manufacturing is carried out under proven quality control and manufacturing processes.

**Environmentally Responsible Manufacturing**

 

ISO 14001 Certification and PV Cycle membership ensures that Hanwha SolarOne's manufacturing is performed with respect for the environment.

# Hanwha Solar

www.hanwha-solarone.com

Release: 2013-04-10    HW3.819.183SCV1

©Hanwha SolarOne Co., Ltd. Specifications are subject to change without notice.

---

## INTERNATIONAL OFFICES

**Hanwha SolarOne Co., Ltd.**
No. 888, Linyang Road, Qidong
Jiangsu Province, 226200, China
Phone: 86-513-8360-6222
Fax: 86-513-8360-6278

**Hanwha SolarOne GmbH**
Headquarter Sales EA-Germany
Oskar Messter Straße 13
85737 Ismaning, Germany
Tel: 49-89-2175-667-30
Fax: 49-89-2175-667-399

**Representative Office-Italy**
Via Santa Maria Valle 3
20123 Milan, Italy
Tel: 39-02-00681-281
Fax: 39 02 00681-400

**Representative Office-France**
21 Avenue Le Corbusier
59042 Lille cedex, France
Tel: 33-359-811-751
Fax: 49-89-2175-667-399

**Representative Office-Spain**
Notari Badia, n4-Local 11
08221 Terrassa, Barcelona, Spain
Tel: 34-931-93-97-63
Fax: 34-901-70-66-22

**Hanwha SolarOne USA**
2424 Walsh Avenue,
Santa Clara, CA 95051

8001 Irvine Center Drive, Suite 1250
Irvine, CA 92618
Tel: 1-714-689-6868
Fax: 1-714-689-6868

For more information, and to contact local sales or after-sales technical support, please visit our website at:
www.hanwha-solarone.com

**EXHIBIT E**

**LIMITED WARRANTY STATEMENT**

**[Attached]**



**LIMITED WARRANTY FOR PV MODULES**

### Chapter I: Twelve Years Limited Product Warranty

Subject to Chapters III and IV hereof, Hanwha SolarOne (Qidong) Co., Ltd. ("**Hanwha SolarOne**") warrants to the original buyer (the "**Buyer**") that the standard photovoltaic modules of Hanwha SolarOne (the "**PV Modules**") shall be free from any defect in materials and workmanship that has an effect on module functionality under normal application, installation, use and service conditions as specified in Hanwha SolarOne's standard product documentation as updated from time to time (the "**Product Documentation**"). If, during a period of twelve (12) years from the date of dispatch of the PV Modules to the Buyer from Hanwha SolarOne's facility (the "**Warranty Start Date**"), the PV Modules fail to conform to the warranty under this Chapter I(the "**Twelve Years Limited Product Warranty**"), then Hanwha SolarOne will, at its sole discretion, either repair or replace the defective PV Modules, or refund the residual value [1] of the PV Modules at the time of Hanwha SolarOne's confirmation of the Buyer's claim.

For the avoidance of doubt, any cosmetic changes, or other changes in the PV Modules appearance, which include but not limited to any color change, abrasion, scratching, oxidation, mold and mechanical wear-out, or any other change attributable to or caused by the normal wear and tear over time, or localized impact, that occurs after the Warranty Start Date, shall be exempt from the Twelve Years Limited Product Warranty. The Buyer will be entitled to make claims under the Twelve Years Limited Product Warranty only if the Buyer has provided documented evidence sufficient to prove that the malfunctioning or non-conformity of the PV Modules results exclusively from the defect of the PV Modules and is covered by the Twelve Years Limited Product Warranty.

The Twelve Years Limited Product Warranty shall only cover the claims received by Hanwha SolarOne before the end of the twelve years warranty period starting from the Warranty Start Date.

The remedies set forth in this Chapter I shall be the Buyer's sole and exclusive remedies under the Twelve Years Limited Product Warranty.

---

[1]  For the purpose of calculating the residual value, the formula shall be: the spot price of a comparable PV Module × (1- a/12). In the above formula, "a" stands for the actual use life of the PV Modules starting from the Warranty Start Date.

The Twelve Years Limited Product Warranty does not warrant a specific power output of the PV Modules, which shall be exclusively covered under Chapter II hereinafter (the "**Guaranteed Peak Power Output Limited Warranty**").

## Chapter II: Guaranteed Peak Power Output Limited Warranty

Provided that the PV Modules are used under normal application, installation, use and service conditions as specified in Hanwha SolarOne's Product Documentation and subject to Chapters III and IV hereof, the following Guaranteed Peak Power Output Limited Warranty is provided by Hanwha SolarOne.

1. First Year Guaranteed Peak Power Output Limited Warranty

    Hanwha SolarOne warrants the power output of the PV Modules as stated below for a period of the first year from the Warranty Start Date. If the minimum "Peak Power Output at STC"[2] for typical poly PV Modules reduces to less than ninety-seven percent (97%) of the labeled power output classification as specified in Hanwha SolarOne's Product Documentation, or if the minimum "Peak Power Output at STC" for typical mono PV Modules reduces to less than ninety-six percent (96%) of the labeled power output classification, Hanwha SolarOne will, at its sole discretion, either a) provide additional PV Modules to the Buyer, or b) repair these underpowered PV Modules, in either case, to restore the actual power output to the guaranteed level as specified in this Section 1, or c) otherwise provide monetary compensation which shall be calculated by multiplying (x) the difference between the actual peak power output of the PV Modules and the guaranteed peak power output as specified in this Section 1 by (y) the then current per watt market price of the comparable PV Modules in a similar market.

2. Second Year to Twenty-fourth Year Guaranteed Peak Power Output Limited Warranty

    Hanwha SolarOne warrants that, for a period from the second year to the twenty-fourth year, the power output of the PV Modules will maintain as set forth below:
    For poly PV Modules, the maximum annual power decline will not be more than 0.7%;
    For mono PV Modules, the maximum annual power decline will not be more than 0.7%;
    If there is any decline exceeding the limitation specified hereinabove, Hanwha SolarOne will, at its

---

[2] "Peak Power at STC" is the power in Watt peak that a PV module generates in its Maximum Power Point. "STC" are as follows (a) light spectrum of AM 1.5, (b) an irradiation of 1,000 W per m2 and (c) a cell temperature of 25 degree centigrade at right angle irradiation. The measurements are carried out in accordance with IEC 60904 as tested at the connectors or junction box terminals -- as applicable – per calibration and testing standards of Hanwha SolarOne valid at the date of manufacture of the PV Modules. Hanwha SolarOne's calibration standards shall be compliant with the standards applied by international institutions accredited for this purpose.

sole discretion, either a) provide additional PV Modules to the Buyer, or b) repair the underpowered PV Modules, in either case, to restore the actual power output to the guaranteed level as specified in this Section 2, or c) otherwise provide monetary compensation which shall be calculated by multiplying (x) the difference between the actual peak power output of the PV Modules and the guaranteed peak power output as specified in this Section 2 by (y) the then current per watt market price of the comparable PV Modules in a similar market.

3. 25 Years Guaranteed Peak Power Output Limited Warranty

Hanwha SolarOne warrants the power output of the PV Modules as stated below for a period of twenty-five (25) years from the Warranty Start Date. If the minimum "Peak Power Output at STC"$_2$ for the PV Modules reduces to less than eighty-two percent (82%) of the labeled power output classification, Hanwha SolarOne will, at its sole discretion, either a) provide additional PV Modules to the Buyer, or b) repair the underpowered PV Modules, in either case, to restore the power output to the guaranteed level as specified in this Section 3, or c) otherwise provide monetary compensation which shall be calculated by multiplying (x) the difference between the actual power output of the PV Modules and the guaranteed power output as specified in this Section 3 by (y) the then current per watt market price of the comparable PV Modules in a similar market.

4. For purpose of this Chapter II, labeled power output classification in Hanwha SolarOne's Product Documentation is the power in Watt peak that a PV Module generates in its maximum power point under STC. The actual power output of the PV Modules shall be determined for verification under STC only. The actual power output measurement shall be either carried out by a Hanwha SolarOne entity or by a Hanwha SolarOne recognized third party testing institute. Testing equipment tolerances will be applied to all actual power output measurements.

5. The Guaranteed Peak Power Output Limited Warranty shall only cover the claims received by Hanwha SolarOne before the end of the respective warranty period in this Chapter II starting from the Warranty Start Date.

6. The remedies set forth in this Chapter II shall be the Buyer's sole and exclusive remedies under the Guaranteed Peak Power Output Limited Warranty.

## Chapter III: Exclusions and Limitations

1. The exclusions and limitations listed below shall apply to all the warranties set forth in above Chapters I and II.

**2.   Exclusions and Limitations**

a)   The "Twelve Years Limited Product Warranty" and the "Guaranteed Peak Power Output Limited Warranty" do not apply when:

    i)     The PV Modules are improperly installed, wired, maintained, or are subjected to inadequate system design, auxiliary instrument, device of the photovoltaic power system;

    ii)    The PV Modules are subjected to inappropriate handling, including but not limited to handling during transportation or storage, abuse, neglect, vandalism, vermin or accident;

    iii)   The PV Modules are moved from its original installation location, uninstalled, reinstalled or otherwise altered;

    iv)   The PV Modules are installed in an environment which exceeds "Standard Operating Conditions" as defined in product specifications and installation manual, installed in a mobile or marine environment, subjected to improper voltage or power surges, or subjected to abnormal environmental conditions (such as acid rain, salt damage or other corrosive chemical);

    v)    The PV Modules are subjected to inappropriate maintenance, including maintenance by an unauthorized service technician or in non-conformance with Hanwha SolarOne's installation manual;

    vi)   The PV Modules are subjected to external accidents or forces such as animals, fire, explosion, and civil disorder;

    vii)  The PV Modules are subjected to other unforeseen circumstances or causes outside Hanwha SolarOne's reasonable control, including but not limited to, electrical surges, lightning, earthquakes, typhoons, hurricanes, tornadoes, volcanic action, floods, tsunami, snow damage, heavy hail, etc;

    viii) The manufacture of the PV Modules is in accordance to the design, technical drawings, formulae or other specifications furnished by the Buyer; or

    ix)   Any warranty claim, in any event, is not submitted to Hanwha SolarOne within the applicable warranty period.

b)   The Buyer shall carry the burden of proof to prove that it is eligible for coverage and that none of the exclusions and limitations listed in this Chapter III shall apply.

## Chapter IV: General Terms and Conditions

The General Terms and Conditions listed below shall apply to all the warranties set forth in above Chapters I and II.

**1.   Disclaimers and Limitation of Liability**

a) DISCLAIMERS

HANWHA SOLARONE PROVIDES ALL DOCUMENTS AND INFORMATION ON AN "AS IS" BASIS.THE WARRANTIES PROVIDED HEREIN ARE IN LIEU OF AND EXCLUDE ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO THE IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE,USE OR, APPLICATION, UNLESS I) SUCH OTHER WARRANTIES ARE EXPRESSLY AGREED TO IN WRITING BY HANWHA SOLARONE UNDER THE RELEVANT SALES AGREEMENT EXECUTED BETWEEN HANWHA SOLARONE AND THE BUYER OR II) OTHER STATUTORY WARRANTY WHICH IS EXPRESSLY PROVIDED IN ANY APPLICABLE MANDATORY LAWS. HANWHA SOLARONE DOES NOT WARRANT THAT THE OPERATION OF THE PV MODULES WILL ACHIEVE THE RESULTS INTENDED BY THE BUYER. IN THE EVENT THAT ANY PROVISION HEREOF (OR ANY PART THEREIN) SHOULD FOR ANY REASON BE HELD INEFFECTIVE UNDER APPLICABLE LAW, THE REMAINDER OF THE PROVISION SHALL REMAIN IN FULL FORCE AND EFFECT.

THE WARRANTIES PROVIDED HEREIN ARE IN LIEU OF AND EXCLUDE ALL OTHER OBLIGATIONS ON THE PART OF HANWHA SOLARONE IN RELATION TO THE DEFECT OF THE PV MODULES UNLESS SUCH OTHER OBLIGATIONS ARE EXPRESSLY AGREED TO IN WRITING BY HANWHA SOLARONE UNDER THE RELEVANT SALES AGREEMENT.

b) LIMITATION OF LIABILITY

TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, HANWHA SOLARONE HEREBY DISCLAIMS, AND SHALL HAVE NO RESPONSIBILITY OR LIABILITY WHATSOEVER FOR DAMAGE TO PROPERTY, OR FOR OTHER LOSS FROM ANY CAUSE WHATSOEVER ARISING OUT OF OR RELATED TO THE PERFORMANCE OR NONPERFORMANCE OF THE RELEVANT SALES AGREEMENT, ANY OF THE PV MODULES OR THEIR USE. TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, UNDER NO CIRCUMSTANCES SHALL HANWHA SOLARONE BE LIABLE TO THE BUYER, FOR ANY LOST PROFITS, LOSS OF USE, LOSS OF DATA OR EQUIPMENT DOWNTIME, OR FOR ANY INCIDENTAL, CONSEQUENTIAL OR SPECIAL DAMAGES OF ANY KIND, HOWSOEVER ARISING, RELATED TO THE PV MODULES, WHETHER OR NOT HANWHA SOLARONE HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGE.

TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, HANWHA SOLARONE'S AGGREGATE LIABILITY, IF ANY, FOR DAMAGES OR OTHERWISE, SHALL NOT EXCEED THE PURCHASE PRICE RECEIVED BY HANWHA SOLARONE FROM THE BUYER.

HANWHA SOLARONE'S LIABILITY FOR FRAUDULENT OR WILFUL INTENT, GROSS NEGLIGENCE OR PERSONAL INJURY, IN EACH CASE, UNDER APPLICALBE MANDATORY LIABILITY LAW SHALL REMAIN UNAFFECTED.

THE BUYER ACKNOWLEDGES THAT THE FOREGOING LIMITATIONS ON LIABILITY UNDER THIS PARAGRAPH b) ARE AN ESSENTIAL ELEMENT OF THE RELEVANT SALES AGREEMENT BETWEEN THE PARTIES AND THAT IN THE ABSENCE OF SUCH LIMITATIONS THE PURCHASE PRICE OF THE PV MODULES WOULD BE SUBSTANTIALLY HIGHER.

SOME JURISDICTIONS LIMIT OR DO NOT PERMIT DISCLAIMERS OF LIABILITY, SO THIS PROVISION MAY NOT APPLY TO THE BUYER IN SAID JURISDICTION. SOME JURISDICTIONS DO NOT ALLOW LIMITATIONS OR THE EXCLUSION OF DAMAGES SO THE ABOVE LIMITATIONS OR EXCLUSIONS MAY NOT APPLY TO THE BUYER IN SAID JURISDICTION. THE BUYER MAY HAVE SPECIFIC LEGAL RIGHTS OUTSIDE THIS LIMITED WARRANTY FOR PV MODULES, AND MAY ALSO HAVE OTHER MANDATORY RIGHTS THAT VARY FROM JURISDICTION TO JURISDICTION, WHICH SHALL REMAIN UNAFFECTED.

c)  The warranty provided under Chapter I "Twelve Years Limited Product Warranty" and Chapter II "Guaranteed Peak Power Output Limited Warranty" covers only the transportation cost for reshipment of any repaired or replaced PV Modules to the destination port set forth in the relevant sales agreement, and cover neither customs clearance, taxes, any other costs related to installation, removal, or reinstallation of the PV Modules, nor any transportation charges for the return of PV Modules to Hanwha SolarOne.

d)  Warranty claims will be honored only if the PV Modules can be identified as being manufactured by Hanwha SolarOne, as indicated by the information on the labels of the PV Modules.

## 2.  Assignment of the Limited Warranty for PV Modules

This Limited Warranty for PV Modules in its entirety, extends only to the Buyer, and is transferrable in its entirety to any other person to whom title to the PV Modules has been transferred provided that a) a prior written notice of such transfer has been received by Hanwha SolarOne, and b) the PV Modules remain installed in their original installation location.

## 3.  Obtaining Warranty Performance/Claim Procedure

a)  The Buyer shall notify Hanwha SolarOne promptly (in no event later than thirty (30) days) from discovery of any breach of the Limited Warranty for PV Modules within applicable warranty period.

The notice shall be in writing and shall include the description of the claim, corresponding PV Modules serial number(s), proof of purchase such as the commercial invoice and sufficient evidences proving such breach of the Limited Warranty for PV Modules.

b)   The return of any PV Modules will not be accepted unless prior written authorization has been given by Hanwha SolarOne.

c)   Any replaced PV Modules shall become the property of Hanwha SolarOne unless otherwise notified by it. Hanwha SolarOne shall be entitled to deliver other comparable PV Modules (different in size, color, shape and/or power output performance) in situations where it deems fit. The repair or replacement of the PV Modules or the delivery with additional PV Modules shall not extend the applicable original warranty period of the "Twelve Years Limited Product Warranty" and the "Guaranteed Peak Power Output Limited Warranty".

## 4.   Disputes

a)   Any dispute arising from or in connection with the claim(s) under this Limited Warranty for PV Modules shall be submitted to binding arbitration and subject to the choice of law as provided in the relevant sales agreement executed between Hanwha SolarOne and the Buyer. Notwithstanding the above, Technical Related Disputes (as defined below) shall be first submitted to non-binding expert's evaluation as provided below.

b)   For purpose of clarification, in this Limited Warranty for PV Modules, the term "Technical Related Disputes" shall mean disputes regarding the function or malfunction of the PV Modules or other related products. The Technical Related Disputes shall be evaluated by an expert appointed by one of the following test institutions listed in paragraph (c) below. The appointed expert shall provide its expert opinion regarding the function of the PV Modules, and the causes of the malfunction (if applicable). The expert shall also provide a suggestion for the adequate resolution of the dispute including monetary compensation if needed. The specific institution which will appoint the expert shall be the institution in paragraph (c) below whose physical location is the closest in distance to the location of the PV Modules in dispute.

c)   Fraunhofer ISE in Freiburg, the Federal Republic of Germany
TÜV Rheinland in Cologne, the Federal Republic of Germany, or
ASU (Arizona State University), USA

d)   The expert's opinion shall be non binding on either party to this Limited Warranty for PV Modules, but may be used as admissible evidence if the dispute is to be resolved through arbitration, court

proceeding or any other form of dispute resolution that the parties may agree upon. For the avoidance of doubt, both parties reserve the right to submit the case to arbitration pursuant to paragraph a) above and to present alternative expert opinion(s) to the arbitration tribunal.

e)  The parties shall cooperate to fully accommodate the appointed expert and shall provide the expert the necessary assistance to promptly complete its tasks. The parties shall bear the fees to be paid to the expert according to their degree of responsibility for any claim under this Limited Warranty for PV Modules.

**Qidong, March 1st, 2013**

**EXHIBIT F**

**FORM OF BUYER PARENT GUARANTY**

# GUARANTY

THIS GUARANTY ("Guaranty"), dated as of _____, 2014, is made by Hanergy Holding Group Ltd., a limited liability company established under the law of the People's Republic of China ("Guarantor"), in favor of Hanwha Solarone U.S.A., Inc., a Limited Liability Company (the "Beneficiary").

Guarantor enters into this Guaranty in consideration of and as an inducement for Beneficiary to enter into that certain Module Supply Agreement, dated _____, 2014 (the "Agreement"), between Beneficiary and Columbia Solar Energy, LLC (D/B/A Columbia Solar Energy Generation, LLC), a Delaware limited liability company ("Company"), and an affiliate of Guarantor.

NOW, THEREFORE, intending to be legally bound hereby and in accordance herewith, Guarantor agrees as follows:

1. <u>Guaranty</u>.   Subject to the terms and provisions hereof, Guarantor hereby irrevocably and unconditionally guarantees to Beneficiary, as primary obligor and not as a surety, the prompt and complete payment by Company when and as due of its payment obligations under the Agreement (the "Guaranteed Liabilities"). Notwithstanding anything to the contrary contained herein or in the Agreement, Guarantor's maximum aggregate liability under this Guaranty shall be capped at, and shall not under any circumstances exceed, the Contract Price as set forth in the Agreement (the "Maximum Amount").

2. <u>Term</u>. This Guaranty shall be an absolute, unconditional and continuing guaranty of payment, and not of collection, and will remain in full force and effect until the date when the Guaranteed Liabilities due under this Guaranty have been paid (the "Guaranty Termination Date"); provided, however, that (i) if this Guaranty is reinstated or its effectiveness continued pursuant to Section 3 hereof, the Guaranty Termination Date shall be extended for the period of such reinstatement or continued effectiveness, and (ii) if the Beneficiary has made a demand for payment under this Guaranty prior to the Guaranty Termination Date, the Guaranty Termination Date shall be extended until all obligations of the Guarantor under this Guaranty have been paid in full. Notwithstanding the foregoing, if a change of control of the Company to an entity that is not an Affiliate of the Company occurs or if the Agreement is assigned by the Company to a third party that is not an Affiliate of the Company, and the Beneficiary consents in writing to such transaction, then unless otherwise provided by written agreement of Guarantor and Beneficiary this Guaranty shall terminate effective as of the effective time of such transaction and the Guarantor shall have no further liability to the Beneficiary hereunder.

3. <u>Waivers of Notice; Certain Defenses; Reinstatement</u>.  Guarantor waives: (a) all defenses that it may have under applicable law as a guarantor or surety (other than any defenses and rights to setoff that Company may have under the Agreement), (b) notice of acceptance, presentment, demand, dishonor, protest, any sale of collateral security and all other notices whatsoever, except for those expressly required hereunder and (c) defenses based upon the insolvency, bankruptcy, or reorganization of Company, the power or authority to enter into and perform under the Agreement, the unenforceability of, or illegality with respect to, the

1

Agreement, any lack or limitation of status or of power, or any incapacity or disability of Company or any trustee or agent thereof, or the failure of Company to have authorized, or to have obtained any approval necessary to enter into or perform under, the Agreement. This Guaranty shall continue to be effective or be reinstated, as the case may be, without any release or discharge of any obligations if at any time any payment of any of the Guaranteed Liabilities is rescinded, avoided, recovered or must otherwise be returned by Beneficiary upon the insolvency, bankruptcy, or reorganization of Company or Guarantor all as though such payment had not been made.

      4.  <u>Representations and Warranties</u>.  Guarantor hereby represents and warrants to Beneficiary as of the date hereof that:

      (a) Guarantor is duly organized and validly existing under the laws of the jurisdiction of its organization or incorporation and in good standing;

      (b) Guarantor has the power to execute, deliver and perform its obligations under this Guaranty, and it has taken all necessary limited liability company action to authorize such execution, delivery and performance.  Such execution, delivery and performance do not (i) violate or conflict with any material law applicable to Guarantor, any provision of its organizational or constitutional documents, or any material order, decree, ruling, rule, promulgation or judgment of any court or other agency of government applicable to it or any of its assets or (ii) breach or constitute a default or event of default under, any material agreement or instrument binding on or affecting it or any of its assets;

      (c) All governmental and other consents, approvals, authorizations, licenses, clearances, registrations and declarations that are required to have been obtained by Guarantor to issue this Guaranty, have been obtained and are in full force and effect; and

      (d) Guarantor's obligations under this Guaranty constitute legal, valid and binding obligations, enforceable in accordance with its terms (subject to applicable bankruptcy, reorganization, insolvency, moratorium or similar laws affecting creditors' rights generally and to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

      5.  <u>Effect of Modifications</u>.  Subject to the terms and provisions hereof, Guarantor acknowledges that its liability under this Guaranty shall be absolute and unconditional and, without limiting the generality of the foregoing, shall not be affected or impaired by (i) any change in the financial condition, objects, constituencies or business of Guarantor, Company or Beneficiary, (ii) any change in the corporate existence, structure, form, name or ownership of Company or Guarantor or any dissolution, liquidation, reorganization, readjustment, merger, spin-off, consolidation, transformation of corporate form, transfer of establishment or other alteration of the legal status or structure of Company or Guarantor, (iii) the bankruptcy, winding-up, liquidation, dissolution, insolvency, reorganization or other similar proceeding affecting Company or its assets or any resulting release, stay or discharge of any Guaranteed Liabilities, or (iv) any lack or limitation of power, incapacity or disability on the part of Company or of its directors, partners or agents or any other irregularity, defect or informality on the part of

Company in respect of the Guaranteed Liabilities. Guarantor further agrees and consents that Beneficiary may at any time and from time to time, without notice to or further consent of Guarantor (x) extend or otherwise change the time, manner or place of payment of, accept, exchange, receive, realize upon, settle, perfect, extend, renew, pay, compromise, discharge, release or surrender any collateral for or with respect to, or renew, any or all of the Guaranteed Liabilities or (y) make any agreement with Company for the acceleration, addition, acceptance, exchange, receipt, realization, settlement, perfection, extension, renewal, payment, compromise, discharge, release or surrender thereof or composition, forbearance or concession in respect of any or all of the Guaranteed Liabilities, in whole or in part, or for any amendment, waiver or other modification of the terms of the Agreement or of the Guaranteed Liabilities.

6. <u>Independent Obligations; Subrogation</u>. Guarantor's obligations under this Guaranty are independent of all obligations of Company to Beneficiary. Beneficiary shall not be required to proceed first against Company or any other Person or any assets thereof or collateral before proceeding against Guarantor under this Guaranty. Guarantor shall not be subrogated to any of the rights of Beneficiary as the result of any payment or enforcement of any of the Guaranteed Liabilities until the Guaranty Termination Date. Effective as of the Guaranty Termination Date, Guarantor shall be subrogated to the rights of Beneficiary against Company with respect to any and all such payments made by Guarantor hereunder, and Beneficiary agrees to take such steps as Guarantor may reasonably request, at Guarantor's expense, to confirm and/or implement such subrogation rights.

7. <u>Notices</u>. All notices and other communications under this Guaranty must be in writing and will be deemed to have been duly given when (i) delivered by hand (with written confirmation of receipt), (ii) sent by telecopier (with written confirmation of receipt), provided that a copy is also mailed to such party, or (iii) when received by the addressee, if sent by a nationally recognized overnight delivery service (receipt requested) or by mailing, certified mail (return receipt requested), in each case to the appropriate addresses and telecopier numbers set forth below (or to such other addresses and telecopier numbers as either party may designate by notice to the other party):

<table>
<tr><td>If to Guarantor:</td><td>Hanergy Holding Group Ltd.<br>Attn: Mr. Zhang Li, Director of Legal Affairs<br>North Park, Olympic Forest Park<br>No. 0-A Anli Road, Chaoyang District<br>Beijing, China 100107</td></tr>
<tr><td>If to Beneficiary:</td><td>Hanwha Solarone U.S.A., Inc.<br>2424 Walsh Avenue<br>Santa Clara, CA 95051<br>U.S.A.</td></tr>
</table>

8. <u>Miscellaneous</u>. This Guaranty and each of its provisions may be waived, modified or varied, in whole or in part, only pursuant to a duly authorized written instrument signed by an authorized officer of both Beneficiary and Guarantor. The headings used in this Guaranty are for convenience of reference only and are not to affect the construction of, or to be

taken into consideration in interpreting, this Guaranty. A signature delivered by facsimile or email shall be deemed to be an original signature for purposes of this Guaranty and shall be binding upon Guarantor as an original signature.

      9.   Successors; Assignment. This Guaranty shall be binding upon the successors and permitted assigns of Guarantor and inure to the benefit of Beneficiary and its successors and assigns. Neither Beneficiary nor Guarantor shall assign this Guaranty or delegate any of its duties hereunder without the express prior written consent of the other party hereto (which consent shall not be unreasonably withheld, conditioned or delayed), and any such purported assignment without such consent shall be void.

      10.  Governing Law. THIS GUARANTY SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF CALIFORNIA, WITHOUT REGARD TO THE CONFLICT OF LAWS PRINCIPLES THEREOF THAT WOULD OTHERWISE DIRECT THE APPLICATION OF THE LAWS OF A DIFFERENT JURISDICTION. THIS GUARANTEE IS PREPARED AND EXECUTED IN THE ENGLISH LANGUAGE ONLY AND ANY TRANSLATIONS OF THIS AGREEMENT INTO ANY OTHER LANGUAGE SHALL HAVE NO EFFECT.

      11.  Arbitration. To the fullest extent permitted by applicable Law, each party hereto (i) agrees that any claim, action or proceeding by such party seeking any relief whatsoever arising out of, or in connection with, including but not limited to enforcing this Guaranty, or the transactions contemplated hereby, shall be settled by arbitration in Hong Kong under the Hong Kong International Arbitration Centre ("HKIAC") Administered Arbitration Rules (the "Rules") in force when the Arbitration Notice is submitted in accordance with the Rules. The Parties hereto waive and agree not to assert any objection that they may now or hereafter have to the laying of the venue of any such proceeding brought in such an arbitration or any claim that any such proceeding brought in such an arbitration has been brought in an inconvenient forum. There shall be three (3) arbitrators. The Guarantor shall choose one (1) arbitrator, the Beneficiary shall choose one (1) arbitrator and the two (2) arbitrators shall jointly select the third arbitrator who shall act as the presiding arbitrator of the arbitration tribunal. If any of the members of the arbitration tribunal have not been appointed within thirty (30) days after the Arbitration Notice is given, the relevant appointment(s) shall be made by the Secretary General of the HKIAC. The award of the arbitration tribunal shall be final and binding upon the Parties, and the prevailing Party may apply to a court of competent jurisdiction for enforcement of such award. The language to be used in the arbitration proceedings shall be English.

      12.  Payment. All payments hereunder shall be made in lawful money of the United States and in immediately available funds to the Beneficiary. The payment obligations of the Guarantor under this Guaranty shall not be discharged by an amount paid in another currency or in another place, whether pursuant to a judgment or otherwise, to the extent that the amount so paid on conversion to United States Dollars and transfer to the designated place of payment under normal banking procedures does not yield the amount of United States Dollars due hereunder. All payments hereunder shall be made free and clear of any withholding or other Taxes, and the amount of any payments shall be increased so that the net amount received by Beneficiary is not reduced by any such withholding.

13. Entire Agreement.  This writing is the complete and exclusive statement of the terms of this Guaranty and supersedes all prior oral or written representations, understandings, and agreements between Beneficiary and Guarantor with respect to the subject matter hereof. Beneficiary and Guarantor agree that there are no conditions to the full effectiveness of this Guaranty.

14. Unenforceable Provisions.  Any provision contained in this Guaranty which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

15. Waiver of Jury Trial.  GUARANTOR AND BENEFICIARY WAIVE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY SUIT, ACTION, OR PROCEEDING RELATING TO THIS GUARANTY.

16. Consequential Damages.  NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY, GUARANTOR SHALL NOT BE REQUIRED TO PAY SPECIAL, EXEMPLARY, PUNITIVE, CONSEQUENTIAL OR INDIRECT DAMAGES OR OPPORTUNITY COSTS OR LOST PROFITS TO BENEFICIARY.

[Signature page follows]

IN WITNESS WHEREOF, Guarantor has duly signed this Guaranty as of the first date written above.

HANERGY HOLDING GROUP LTD.

By: _____

Name:
Title:      Legal Representative

Accept and agreed to:

Hanwha Solarone U.S.A., Inc.

By _____
Name:
Title:

**EXHIBIT F-2**

**FORM OF SELLER PARENT GUARANTY**

**EXHIBIT G**

**CA LIEN WAIVER FORMS**

## CONDITIONAL WAIVER AND RELEASE UPON FINAL PAYMENT
## CALIFORNIA CIVIL CODE SECTION 8136

**NOTICE: THIS DOCUMENT WAIVES THE CLAIMANT'S LIEN, STOP PAYMENT NOTICE, AND PAYMENT BOND RIGHTS EFFECTIVE ON RECEIPT OF PAYMENT. A PERSON SHOULD NOT RELY ON THIS DOCUMENT UNLESS SATISFIED THAT THE CLAIMANT HAS RECEIVED PAYMENT.**

**Identifying Information**

Name of Claimant: _____
Name of Customer: _____
Job Location: _____
Owner: _____

**Conditional Waiver and Release**

This document waives and releases lien, stop payment notice, and payment bond rights the Claimant has for labor and service provided, and equipment and material delivered, to the Customer on this job. Rights based upon labor or service provided, or equipment or material delivered, pursuant to a written change order that has been fully executed by the parties prior to the date that this document is signed by the Claimant are waived and released by this document, unless listed as an Exception below. This document is effective only on the Claimant's receipt of payment from the financial institution on which the following check is drawn:

Maker of Check: _____
Amount of Check: $ _____
Check Payable to: _____

**Exceptions**

This document does not affect any of the following:
Disputed claims for extras in the amount of: $_____

**Signature**

Claimant's Signature: _____
Claimant's Title: _____
Date of Signature: _____

ACKNOWLEDGEMENT

State of _____

County of _____

On _____before me, personally appeared _____ (here    insert name and title of the officer), who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument. I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.
(Seal)                                          _____
                                                Notary Signature

## UNCONDITIONAL WAIVER AND RELEASE UPON FINAL PAYMENT
## CALIFORNIA CIVIL CODE SECTION 8138

**NOTICE TO CLAIMANT: THIS DOCUMENT WAIVES AND RELEASES LIEN, STOP PAYMENT NOTICE, AND PAYMENT BOND RIGHTS UNCONDITIONALLY AND STATES THAT YOU HAVE BEEN PAID FOR GIVING UP THOSE RIGHTS. THIS DOCUMENT IS ENFORCEABLE AGAINST YOU IF YOU SIGN IT, EVEN IF YOU HAVE NOT BEEN PAID. IF YOU HAVE NOT BEEN PAID, USE A CONDITIONAL WAIVER AND RELEASE FORM.**

**Identifying Information**

Name of Claimant: _____
Name of Customer: _____
Job Location: _____
Owner: _____

**Unconditional Waiver and Release**

This document waives and releases lien, stop payment notice, and payment bond rights the Claimant has for all labor and service provided, and equipment and material delivered, to the Customer on this job. Rights based upon labor or service provided, or equipment or material delivered, pursuant to a written change order that has been fully executed by the parties prior to the date that this document is signed by the Claimant, are waived and released by this document, unless listed as an Exception below. The Claimant has been paid in full.

**Exceptions**

This document does not affect any of the following:
Disputed claims for extras in the amount of: $ _____.

**Signature**

Claimant's Signature: _____
Claimant's Title: _____
Date of Signature: _____

ACKNOWLEDGEMENT
State of _____
County of ____
On _____before me, personally appeared _____ (here insert name and title of the officer), who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument. I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.                    _____
(Seal)                                                Notary Signature

## EXHIBIT B-1

### PROCUREMENT FEE

Payment and Post-Closing Date Adjustments to the Procurement Fee

1. On the Closing Date, the Project Company shall pay Hanergy $20,000,000.00 of the Procurement Fee (consisting of the sum of (a) the Procurement Fee Advances previously made by Buyer pursuant to the PSA *plus* (b) $12,000,000.00) *plus or minus* (as applicable) any Payment Adjustments occurring on or prior to the Closing Date (the "Mechanical Completion Payment").

2. Within five (5) business days following the achievement of Substantial Completion (as defined in the EPC Agreement), the Project Company shall pay Hanergy $8,000,000.00 of the Procurement Fee *plus or minus* (as applicable) any Payment Adjustments occurring after the Closing Date through the date of Substantial Completion (the "Substantial Completion Payment").

3. Upon the earlier of (A) five (5) business days following the achievement of Final Completion (as defined in the EPC Agreement) or (B) forty-five (45) days following the date of Substantial Completion, the Project Company shall pay Hanergy $3,906,800.00 of the Procurement Fee *plus or minus* (as applicable) any Payment Adjustments occurring after the date of Substantial Completion through the date of Final Completion (the "Final Payment").

The Procurement Fee, the Mechanical Completion Payment, the Substantial Completion Payment and the Final Payment shall all be subject to adjustment as follows:

a. The Procurement Fee shall be reduced (or increased), on a dollar for dollar basis, (X) to the extent that the base Contract Price (as defined in the EPC Agreement) shall be greater than $22,900,000 (exclusive of Change Orders (as defined in the EPC Agreement) and (Y) for any additive (or deductive) Change Orders from the Contractor, which are accepted by the Project Company prior to the Closing, except for any (i) Change Orders (either requested by the Project Company or Contractor) that relate to a Change in Law (as defined in the EPC Agreement) or (ii) Change Orders requested by the Buyer (each, a "Change Order Adjustment"). Change Orders issued after the Closing Date shall be solely for the account of Buyer. For the avoidance of doubt, a Change Order relating to the installation of permanent communications equipment shall not be considered a Change Order requested by Buyer. Notwithstanding the foregoing, each Party shall use commercially reasonable efforts to cooperate in a lawful arrangement, which does not constitute a breach of the Lease, designed to realize and apportion among the Parties any value, which shall be realized by the Project Company under any set-off provision under the Lease, to the extent that the right of the Project Company to such set-off accrued prior to the Closing Date. Notwithstanding the foregoing, the obligations of the Parties under this paragraph (a) shall not include any requirement for a Party to expend money, commence or participate in any

EXECUTION VERSION

litigation or offer or grant any accommodation (financial or otherwise) to any third party.

b.  The Procurement Fee shall be increased or reduced based upon the actual cost of annual real estate taxes for the Site at the time that the Final Payment is due.  For every $1,000 that the actual cost of such taxes are greater (or less) than $25,000 per year, the Final Payment shall be reduced (or increased) by $16,660 (a "RE Tax Adjustment").   In the event that the initial reassessment of the Site following the subdivision contemplated in the Lease has not occurred as of the date Final Payment is due, but is completed within one year of Final Completion (as defined in the EPC Agreement), and such initial reassessment results in a reduction in the actual cost of annual real estate taxes for the Site, Project Company shall reimburse Hanergy the difference between the actual amount of the RE Tax Adjustment reduction made at the time of Final Payment and the amount of the RE Tax Adjustment calculated based on the formula above and based on the actual cost of annual real estate taxes following such initial reassessment.  Such reimbursement, if any, shall be made within 30 days of the initial reassessment.

c.  In the event that the actual O&M fee in the O&M Agreement entered into by the Project Company at or prior to Closing is greater (or less) than the fee set forth in the form of O&M Agreement attached as Exhibit K to the PSA, the Procurement Fee shall be reduced (or increased).  For every $1.00 (in $/kWdc) that the actual cost of such O&M Fee is greater (or less) than the fee set forth in the form of O&M Agreement attached as Exhibit K to the PSA, the Procurement Fee shall be reduced (or increased), on a *pro rata* basis, by $162,000 (an "O&M Fee Adjustment").

d.  To the extent that the Project does not achieve the Commercial Operation Date (as defined in the Power Purchase Agreement) by the Guaranteed Commercial Operation Date (as defined in the EPC Agreement, as amended), the Procurement Fee shall be reduced, on a dollar for dollar basis, by 45% of the Daily Energy Value (as defined in Exhibit F to the EPC Agreement) for each day that the Project has not achieved Substantial Completion during the period commencing on the Guaranteed Commercial Operation Date through May 20, 2015 (a "Delay LD Adjustment").

e.  The Procurement Fee shall be adjusted for the following items (the "Miscellaneous Adjustments"):

    i.  Increased, by the amount of any amounts owing to the Project Company, which are (x) disclosed by Hanergy in writing to the Buyer on or prior to the Closing  and (y) actually paid to the Project Company within one year following the Closing.  In the event such amounts are received by the Project Company following the date of the Final Payment and within one year of the Closing, the Project Company shall reimburse Hanergy for such amounts within 30 days of its receipt of payment.

EXECUTION VERSION

      ii.  Increased or decreased, as applicable, at cost, for on-Site spare solar modules, to extent there are less than or greater than 60kw of modules, provided that in no event shall there be more than 120kw of spare modules at Closing.

    f.  A Change Order Adjustment, a RE Tax Adjustment, an O&M Fee Adjustment, a Delay LD Adjustment or a Miscellaneous Adjustment shall be referred to herein individually as a "<u>Payment Adjustment</u>," and collectively, as "<u>Payment Adjustments</u>").

## EXHIBIT B-2

## OTHER REIMBURSABLE COSTS

### Prior EPC Payments

At least 10 business days prior to the Closing Date, Hanergy shall provide the Buyer a written invoice for all amounts of the Contract Price (as defined in the EPC Agreement) paid by the Project Company on or prior to the Closing Date, plus all interconnection costs paid by the Project Company in excess of the SGIA Deposits, which are identified by PG&E prior to the Closing Date as being reimbursable to the Project Company under the SGIA (collectively, the "Prior EPC Payments"), together with documentary evidence, reasonably satisfactory to the Buyer, that (i) all of the Prior EPC Payments have been paid in full and (ii) all Work (as defined in the EPC Agreement) necessary to achieve the milestones relating to such Prior EPC Payments has been completed (collectively, the "EPC Payment Documentation").  Provided that all of the EPC Payment Documentation has been submitted to the Buyer in accordance with the foregoing, the Project Company shall reimburse Hanergy for the Prior EPC Payments on the Closing Date.

*Execution Copy*

# AMENDMENT NO. 1 TO
# MASTER PROCUREMENT AGREEMENT

This Amendment No. 1 to Master Procurement Agreement (this "***Amendment***") dated as of August 5, 2015 (the "*1ˢᵗ **Amendment Effective Date***"), is made and entered into by and by and between Hanergy Thin Film Power America, Inc. (f/k/a Hanergy USA Solar Solution Ltd.), a California corporation (d/b/a Hanergy America Solar Solutions) *("**Hanergy**")*, and Columbia Solar Energy, LLC, a Delaware limited liability company (the "***Project Company***"). Hanergy and Project Company are each referred to individually as a "***Party***" and, collectively, as the "***Parties***".

## W I T N E S S E T H:

WHEREAS, Hanergy and the Project Company entered into a Master Procurement Agreement (the "***Agreement***") on October 1, 2014, wherein the Project Company engaged Hanergy to procure and provide or assist it in procuring the Equipment described in the supply agreement(s) and purchase order(s) attached as <u>Exhibit A</u> to the Agreement.

NOW, THEREFORE, in consideration of the premises and the mutual representations, warranties, covenants and agreements in this Amendment and the Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

## ARTICLE I.
## AMENDMENT

Section 1.1     <u>Amendment</u>. The Agreement is hereby amended as follows:

(a)     The defined term "Procurement Fee" in the first sentence of Section 2(a) shall mean "Thirty Million Nine Hundred Six Thousand and Eight Hundred Dollars ($30,906,800.00).

(b)     <u>Exhibit B-1</u> to the Agreement is deleted in its entirety and replaced with the form of <u>Exhibit B-1</u> attached hereto; and

## ARTICLE II.
## MISCELLANEOUS

Section 2.1     <u>Miscellaneous.</u>   The provisions of 12 (Governing Law) of the Agreement shall apply, *mutatis mutandis*, to this Amendment.

***[Signature Block on Following Page]***

**IN WITNESS WHEREOF**, this Amendment has been duly executed and delivered by the duly authorized officer of each Party as of the date hereof.

HANERGY THIN FILM POWER AMERICA, INC. (d/b/a HANERGY AMERICA SOLAR SOLUTIONS)

By: _____

Name: Yi Wu

Title: Chief Executive Officer

COLUMBIA SOLAR ENERGY, LLC

By: _____

Name: Yi Wu

Title: Chief Executive Officer

*Signature page to MPA Amendment*

## EXHIBIT B-1

### PROCUREMENT FEE

<u>Payment and Post-Closing Date Adjustments to the Procurement Fee</u>

1. On the Closing Date, the Project Company shall pay Hanergy $19,000,000.00 of the Procurement Fee (consisting of the sum of (a) the Procurement Fee Advances previously made by Buyer pursuant to the PSA *plus* (b) $11,000,000.00) *plus or minus* (as applicable) any Payment Adjustments occurring on or prior to the Closing Date (the "Mechanical Completion Payment").

2. Within five (5) business days following the achievement of Substantial Completion (as defined in the EPC Agreement), the Project Company shall pay Hanergy $8,000,000.00 of the Procurement Fee *plus or minus* (as applicable) any Payment Adjustments occurring after the Closing Date through the date of Substantial Completion (the "Substantial Completion Payment").

3. Upon the earlier of (A) five (5) business days following the achievement of Final Completion (as defined in the EPC Agreement) or (B) forty-five (45) days following the date of Substantial Completion, the Project Company shall pay Hanergy $3,906,800.00 of the Procurement Fee *plus or minus* (as applicable) any Payment Adjustments occurring after the date of Substantial Completion through the date of Final Completion (the "Final Payment").

The Procurement Fee, the Mechanical Completion Payment, the Substantial Completion Payment and the Final Payment shall all be subject to adjustment as follows:

    a. The Procurement Fee shall be reduced (or increased), on a dollar for dollar basis, (X) to the extent that the base Contract Price (as defined in the EPC Agreement) shall be greater than $22,900,000 (exclusive of Change Orders (as defined in the EPC Agreement) and (Y) for any additive (or deductive) Change Orders from the Contractor, which are accepted by the Project Company prior to the Closing, except for any (i) Change Orders (either requested by the Project Company or Contractor) that relate to a Change in Law (as defined in the EPC Agreement) or (ii) Change Orders requested by the Buyer (each, a "Change Order Adjustment"). Change Orders issued after the Closing Date shall be solely for the account of Buyer. For the avoidance of doubt, a Change Order relating to the installation of permanent communications equipment shall not be considered a Change Order requested by Buyer. Notwithstanding the foregoing, each Party shall use commercially reasonable efforts to cooperate in a lawful arrangement, which does not constitute a breach of the Lease, designed to realize and apportion among the Parties any value, which shall be realized by the Project Company under any set-off provision under the Lease, to the extent that the right of the Project

Company to such set-off accrued prior to the Closing Date. Notwithstanding the foregoing, the obligations of the Parties under this paragraph (a) shall not include any requirement for a Party to expend money, commence or participate in any litigation or offer or grant any accommodation (financial or otherwise) to any third party.

b.  The Procurement Fee shall be increased or reduced based upon the actual cost of annual real estate taxes for the Site at the time that the Final Payment is due. For every $1,000 that the actual cost of such taxes are greater (or less) than $25,000 per year, the Final Payment shall be reduced (or increased) by $16,660 (a "RE Tax Adjustment"). In the event that the initial reassessment of the Site following the subdivision contemplated in the Lease has not occurred as of the date Final Payment is due, but is completed within one year of Final Completion (as defined in the EPC Agreement), and such initial reassessment results in a reduction in the actual cost of annual real estate taxes for the Site, Project Company shall reimburse Hanergy the difference between the actual amount of the RE Tax Adjustment reduction made at the time of Final Payment and the amount of the RE Tax Adjustment calculated based on the formula above and based on the actual cost of annual real estate taxes following such initial reassessment. Such reimbursement, if any, shall be made within 30 days of the initial reassessment.

c.  In the event that the actual O&M fee in the O&M Agreement entered into by the Project Company at or prior to Closing is greater (or less) than the fee set forth in the form of O&M Agreement attached as Exhibit K to the PSA, the Procurement Fee shall be reduced (or increased). For every $1.00 (in $/kWdc) that the actual cost of such O&M Fee is greater (or less) than the fee set forth in the form of O&M Agreement attached as Exhibit K to the PSA, the Procurement Fee shall be reduced (or increased), on a *pro rata* basis, by $162,000 (an "O&M Fee Adjustment").

d.  To the extent that the Project does not achieve the Commercial Operation Date (as defined in the Power Purchase Agreement) by the Guaranteed Commercial Operation Date (as defined in the EPC Agreement, as amended), the Procurement Fee shall be reduced, on a dollar for dollar basis, by 45% of the Daily Energy Value (as defined in Exhibit F to the EPC Agreement) for each day that the Project has not achieved Substantial Completion during the period commencing on the Guaranteed Commercial Operation Date through May 20, 2015 (a "Delay LD Adjustment").

e.  To the extent not paid by Columbia Solar prior to the Closing Date, the Procurement Fee shall be reduced for payments to be made by Columbia Solar under the Landscaping Proposal from Cleary Bros. Landscaping, Inc. ("Cleary Bros") to Columbia Solar Energy, LLC, dated July 8, 2015, not to exceed one hundred twenty five percent (125%) of the amount of

the full consideration to be paid to Cleary Bros as set forth in such proposal (a "Landscaping Adjustment").

f.  To the extent not paid by Columbia Solar prior to the Closing Date, the Procurement Fee shall be reduced for payments to be made by Columbia Solar under the WRECO Wetland Biologist Monitoring Engagement, unexecuted as of July 16, 2015, not to exceed $20,000, concerning monitoring services to be performed by WRECO over a 2-3 year period required in the draft Columbia Solar Energy Project, Monitoring Plan, City of Pittsburg, Contra Costa County, California, May 2015.  As of the date hereof such Monitoring Plan remains subject to the review and approval of the San Francisco Regional Water Quality Board (a "Wetland Monitoring Adjustment").

g.  To the extent not paid by Columbia Solar prior to the Closing Date, the Procurement Fee shall be reduced for payments to be made by Columbia Solar to AECOM (f/k/a URS Corporation) ("URS") under the Workplan for Simultaneous Monitoring of Earthmoving and Construction, dated January 23, 2015 (a "URS Adjustment").

h.  The Procurement Fee shall be adjusted for the following items (the "Miscellaneous Adjustments"):

   i.  Increased, by the amount of any amounts owing to the Project Company, which are (x) disclosed by Hanergy in writing to the Buyer on or prior to the Closing  and (y) actually paid to the Project Company within one year following the Closing.  In the event such amounts are received by the Project Company following the date of the Final Payment and within one year of the Closing, the Project Company shall reimburse Hanergy for such amounts within 30 days of its receipt of payment.

   ii.  Increased or decreased, as applicable, at cost, for on-Site spare solar modules, to extent there are less than or greater than 60kw of modules, provided that in no event shall there be more than 120kw of spare modules at Closing.

i.  A Change Order Adjustment, a RE Tax Adjustment, an O&M Fee Adjustment, a Delay LD Adjustment, a Landscaping Adjustment, a Wetland Monitoring Adjustment, a URS Adjustment or a Miscellaneous Adjustment shall be referred to herein individually as a "Payment Adjustment," and collectively, as "Payment Adjustments").